382 P.2d 229

**STATE of Arizona, Appellee,**

v.

**Alvord JACKSON, Appellant.**

No. 1263.

Supreme Court of Arizona.

En Banc.

May 29, 1963.

**118**

Edwin R. Powell, Holbrook, for appellant.

Robert W. Pickrell, Atty. Gen., and Merton E. Marks, Asst. Atty. Gen., for appellee.

STRUCKMEYER, Justice.

Alvord Jackson was charged and convicted of murder in the second degree for the admitted shooting of one George Evans. His appeal presents questions concerning the rejection of testimony and the instructions to the jury on the issue of self-defense.

The nature of the appeal requires a somewhat detailed statement of the evidence. Defendant and Evans were both residents of McNary, Arizona, being employed by and living on the premises of Southwest Lumber Industries. On the premises was also a building described as the American Legion Club which contained a cafe, a barber shop and a room used as a game and clubroom. Defendant operated the barber shop for two years prior to the homicide. Both defendant and Evans were accustomed to visiting the clubroom. This room contained a pool table, a table for card games, vendors, stools and a stove and could accommodate twenty-five to thirty persons.

About 7:00 to 7:30 P.M. on the evening of March 17, 1961, defendant was in the clubroom shooting dice with several others. Evans came in and joined the game. Defendant first lost but then won by betting against Evans who had the dice. Evans became angry. The testimony of a state's witness gives generally the substance of what followed:

"So George failed with the dice and he says, 'I told you not to fade me anymore'. He say, 'I cannot hit you and I asked you not to get on top of my money'. Jackson spoke, he says, 'George, when you win my money you don't say nothing; how come you get mad when I win your's?' And George turns to him and catches him by the collar like he was going to hit him and Alvord says, 'George don't do that', and George says, 'if you even breathe'

he says, 'I will blow you through the wall.' At that time I didn't see a gun on either one of them. I walked over and I told George not to do that, and I said, 'Jackson, why don't you go home', I says, 'Don't say nothing to George and he won't say nothing to you.' I got them separated and Jackson walks over by the heater and stands there, and George went around to the end of the table and stands there, probably about ten seconds and Jackson looks like he decided to go home. He attempted to go out the door; George walks between him and the doorway and stared at him and Jackson turns around and goes back and stands up and I walked back to Jackson and I says, 'don't pay no attention to George and just forget it' and every-thing got quiet and they disappeared both of them, * * *."

Defendant testified that after Evans left the club he, defendant, went to his room in a nearby house where he obtained a 38 caliber gun and then went to his barber shop and chatted with one Elgin North who was shining shoes and with Roland Jones, a deputy sheriff. Thereafter, he changed his jacket, went back home and returned to the club.

He stated:

"I thought I would go in, I wanted to see Elgin (North), and also I thought if I found George I would talk to him. I have before and I didn't know——."

Defendant testified that he saw Evans standing on the porch; that Evans then went inside; that defendant stayed outside for a few minutes; that he smoked a ciga-rette; that he then went into the building down the hallway to the opening of the clubroom.

The evidence generally places Evans at the corner of the pool table nearest the door. Defendant testified that as he stood in the doorway of the clubroom Evans turned and looked at him. He then de-scribed the shooting as follows (omitting questions):

"He (Evans) turned around, taken his hand and run it up to his coat.

  *    *    *    *    *    *

"I spoke to him, I says, 'George why did you do me like that'.

  *    *    *    *    *    *

"Then I kind of glanced over at Elgin (North). He still had his hand on his coat just like he did before, and then I heard a voice, I am looking al-most at him and I am looking kind of at Elgin. I heard someone say, 'don't do that George.'

  *    *    *    *    *    *

"I was standing in the doorway when they said, 'don't do that George', I looked up and seen a gun like this.

  *    *    *    *    *    *

"Then I seen the gun and he did something like this, in this motion.

\* \* \* \* \* \*

"Like he was still trying to cock it.

\* \* \* \* \* \*

"I left my right foot in the doorway and stepped straight back.

\* \* \* \* \* \*

"I was standing in the doorway just like this, walked up in the doorway, and George was standing at an angle with me here. When he turned he had both hands on that gun, headed up like this and evidently trying to cock it to fire it.

\* \* \* \* \* \*

"I pulled the gun from my pocket, pulled the gun and fired it.

\* \* \* \* \* \*

"I fired it one time then.

\* \* \* \* \* \*

" \* \* \* I pulled up and fired and he stepped forward and pointed down the hall again. I fired and I just stepped over to the other side and he put the gun right in my face again.

\* \* \* \* \* \*

"I backed up and he turned and started toward the wall; the door was to the right and then he turns and places the gun right down at me like that.

\* \* \* \* \* \*

"I fired again, and he turned and fell over in this corner and he stayed right there.

\* \* \* \* \* \*

"I heard Mr. Russell say, 'don't shoot, he is down, I got his gun.' "

Defendant also testified that when he saw Evans put his hand in his coat he thought he was going to pull a gun out any time for the reason that he had seen the gun two weeks before when Evans had taken it out of his car pocket and once before when he had pulled it out in the barber shop. He also testified that he was afraid Evans was going to kill him and that he fired to protect himself.

■ In addition to the above defendant testified that about three months prior to March 17, on the occasion of a card game in Pinetop, Arizona, Evans had become angry and had threatened to kill him. The evidence of one Aubry Cheatham was offered by defendant to corroborate this. Further defendant offered the testimony of a witness to show that Evans carried a gun in his coat, and had made threats to use it and the witness had informed defendant of these facts a week before the shooting. The trial court rejected both offers. This was error.

■ The state concedes that evidence of the bad reputation of the deceased may be admitted when there is a prima facie

showing of self-defense. However, it is contended that acts of deceased not directly observed by the defendant nor connected with him are inadmissible. In Mendez v. State, 27 Ariz. 82, 229 P. 1032, this Court expressly adopted the modern rule that an accused should generally be permitted to introduce evidence of specific acts of violence by the deceased toward other persons either coming under his own observation or known to the defendant prior to the homicide. Personal observation by a defendant is not required but only that he be informed of the acts. The purpose of such evidence is not to prove the deceased in fact performed such acts but that defendant may have had reason to believe he had and that this adds to a justifiable state of apprehension. See Anno. 121 A.L.R. 380, 390. Here, the excluded evidence tended to show that defendant had knowledge that deceased carried a weapon and that he was of a violent and turbulent disposition. It would have a bearing on defendant's state of mind and the reasonableness of his belief that Evans was capable of harming him at the time of the homicide.

■ Defendant requested an instruction that the law of Arizona does not require a person to retreat before he may act lawfully in self-defense. In this jurisdiction the rule as to retreat applies even if it appears that safety might more easily

have been gained by withdrawing from the scene or by flight. Macias v. State, 36 Ariz. 140, 283 P. 711; Foster v. Territory, 6 Ariz. 240, 56 P. 738. Refusal to give such instruction was palpably error.

■ The prosecution argued in the court below and to the jury and it is argued here that defendant, having gone home to a place of safety, waived his right of self-defense by returning to the clubroom; that he thereby became the aggressor and could not claim the right to stand his ground. The state relies on Lepker v. State, 40 Ariz. 186, 11 P.2d 351 in which we held that the accused defendant who voluntarily accompanied another to a lonely spot for the purpose of jointly robbing third persons was not entitled to the claim of self-defense. There the defendant shot his companion in the back claiming he thought his companion at some future time intended to shoot him without warning. The decision in Lepker should not be applied to a situation as here where the effect would be to hold that one who is threatened by another may only leave his home and go about his affairs at the peril of forfeiting his own rights of self-defense.

The state's position is that the defendant had the right to stand his ground only when he was in his own home or on his own premises. This is not the law of this state. In Foster v. Territory, 6 Ariz. 240, 56 P. 738, supra, we quoted from Beard v.

United States, 158 U.S. 550, 15 S.Ct. 962, 39 L.Ed. 1086, that:

> "The weight of modern authority, in our judgment, establishes the doctrine that, when a person, being without fault, and in a place where he has a right to be, is violently assaulted, he may, without retreating, repel force by force; and if, in the reasonable exercise of his right of self-defense, his assailant is killed, he is justifiable." 6 Ariz. at 244, 56 P. at 739.

■ In Macias v. State, 36 Ariz. 140, 283 P. 711, supra, the defendant was invading the premises of the deceased with a demonstrated intent to force himself on defendant's niece. This distinction was made:

> " * * * it is the law in this state that a man in a place where he has the right to be is not obliged to follow the old English doctrine of retreat to the wall, but may stand his ground and kill his assailant to avoid death or great bodily harm. But it is not and never has been the law, even in Arizona, that a man who is a trespasser and in a place where he has no right to be may stand his ground and slay his assailant, and still claim self-defense, when by leaving such place he might avoid the conflict. * * * Under the undisputed evidence in this case, defendant was in a place where he had no right to be, that he had been warned by the owners to stay away from and at a time and under circumstances which made his presence utterly inexcusable. * * * " 36 Ariz. at 157, 283 P. at 717.

There can be no question but that defendant had a right to be in the clubroom. He was certainly not a trespasser. Before an act may cause forfeiture of the fundamental right of self-defense it must be willingly and knowingly calculated to lead to conflict. The act of returning to the clubroom is not such an act unless it was one deliberately calculated to lead to further conflict. Merely seeking an interview is not such an act. See Anno. 45 L.R.A. 687, 700. On who merely does an act which affords an opportunity for conflict is not thereby precluded from claiming self-defense. Fault implies misconduct not lack of judgment. State v. Bristol, 53 Wyo. 304, 84 P.2d 757. That one is armed does not foreclose the right of self-defense if otherwise the defendant would have been entitled to the defense. Thompson v. United States, 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146; Foutch v. State, 95 Tenn. 711, 34 S.W. 423, 45 L.R.A. 687.

Our examination of the court's instructions touching on the law of self-defense convinces us that they were unnecessarily complex. The language of the statute, A.R.S. § 13-462 clearly sets forth when

self-defense may be claimed and the applicable portions thereof could properly have been read to the jury. Although the facts warrant the giving of instructions enlarging on particular aspects of the defense, caution should be exercised not to emphasize a part out of proportion to the whole.

Judgment reversed.

BERNSTEIN, C. J., UDALL, V. C. J., and JENNINGS and LOCKWOOD, JJ., concur.