768 S.E.2d 232

The STATE, Appellant,

v.

Graham Franklin DOUGLAS, Respondent.

Appellate Case No. 2013–000148.

No. 5286.

Court of Appeals of South Carolina.

Heard Sept. 10, 2014.

Decided Dec. 23, 2014.

Rehearing Denied Feb. 19, 2015.

308

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Alphonso Simon Jr., all of Columbia; and Solicitor Ernest Adolphus Finney III, of Sumter, for Appellant.

S. Jahue Moore, Michael Brooks Biediger, and Margaret Amelia Hazel, all of Moore Taylor Law Firm, P.A., of West Columbia, for Respondent.

GEATHERS, J.

The State seeks review of a circuit court order granting Respondent Graham Franklin Douglas immunity from prosecution for murder and possession of a weapon during the commission of a violent crime pursuant to the Protection of Persons and Property Act, S.C.Code Ann. §§ 16–11–410 to –450 (Supp.2013). We affirm.

## FACTS/PROCEDURAL HISTORY

At the hearing on Respondent's motion to dismiss the indictment, Respondent testified concerning the events leading up to the shooting of his longtime friend Charles Eden Smith. According to Respondent, on May 31, 2011, Smith and Respondent went to play golf at Green River Country Club near Chesterfield. They arrived at the golf course between nine and ten o'clock in the morning and left between three o'clock and four-thirty in the afternoon. During this time, the two men shared a medium-sized bottle of vodka, and they purchased another medium-sized bottle of vodka on their way back to Respondent's house from the golf course. When they arrived at the small house, the two men began drinking the second bottle of vodka while sitting in lawn chairs in Respondent's backyard.

At approximately five o'clock that evening, Respondent and Smith went inside Respondent's house, where the two men continued drinking vodka. Smith then went to the bathroom inside Respondent's bedroom suite and locked the bedroom door because the bathroom did not have a door.

When Smith came out of the bedroom, he was holding a bottle of Respondent's anti-anxiety medication, which Respondent kept in a dresser drawer next to his bed.[1] Smith stated, "Look what I found," to which Respondent replied, "No, no, no, no, I need those. Give them to me." As Respondent attempted to grab the bottle, Smith moved the bottle between his left hand and right hand. Smith then placed the bottle on the bar in the kitchen. As Respondent reached for the bottle, Smith slid the bottle back and forth on the bar, continuing to taunt Respondent. Respondent finally exclaimed "G * * d * * * it, give me my medicine," and Smith then "snapped" and "went crazy." Smith grabbed Respondent by his upper arms and threw him up against the refrigerator, causing Respondent to hit his head.[2]

---

1. Respondent testified he suffered from panic attacks and chronic insomnia, in addition to attention deficit disorder and dyslexia. The medication prescribed for Respondent for his anxiety and insomnia was Clonazepam.

2. Respondent actually testified that Smith grabbed him by his shoulders. However, photographs of Respondent's injuries show severe bruising on Respondent's upper arms.

Smith held him there, and Respondent felt his knees buckle underneath him.[3] When Smith released Respondent, Respondent fell on the floor and hit his head again. Smith got on top of Respondent and struck Respondent in the eye. Respondent told Smith several times to leave him alone and to leave his house, but Smith refused to do so. Smith bit Respondent on his leg, then backed off, went into the dining room, and started laughing. Unable to walk at that moment, Respondent crawled into his bedroom, which was adjacent to the kitchen.

Respondent then crawled up onto his bed and again told Smith to leave the house. As Respondent sat on the bed, Smith lingered, so Respondent retrieved a pistol from the dresser drawer next to his bed and set the pistol next to himself on the bed. Smith continued to laugh and refused to leave. Respondent then stood up and went to the kitchen's threshold, with the pistol by his side, and once more told Smith to leave. However, Smith, whose eyes "looked like a man possessed," began advancing toward Respondent.

When Respondent realized Smith was not going out the front door, Respondent lifted the pistol in an attempt to scare Smith away. Respondent was "terrified" because Smith "had already [attacked Respondent] once." When Smith was approximately two feet away from Respondent, Respondent fired the pistol. The bullet hit Smith in the chest, piercing his heart. He fell to the floor, struggling to breathe, and died within minutes.

Respondent ran to his parents' house next door to call 911. Before the 911 dispatcher could answer, Respondent blurted out: "Hey, I just shot [Smith]." When the dispatcher answered, Respondent stated: "Yeah, I need an ambulance out here." After the dispatcher asked for more detailed information, Respondent gave the phone to his father. Respondent's father told the dispatcher he believed someone had been shot and gave the dispatcher a street address. Respondent returned to his house and took some Clonazepam before the police arrived.

---

**3.** The evidence shows that Respondent likely sustained a concussion when his head hit the refrigerator.

Because Respondent's father was employed by the Chesterfield County Sheriff's Office, that office asked the South Carolina Law Enforcement Division (SLED) to investigate the case and instructed its deputies to secure the scene until SLED arrived. When Deputy Dana Wallace arrived, he asked Respondent "What is going on?" Respondent stated, "He come [sic] at me with a gun and I shot him." Both Deputy Wallace and Sergeant Wayne Jordan testified that Respondent appeared "highly intoxicated." Deputy Wallace instructed two other deputies to detain Respondent. During the next several hours, Respondent spontaneously uttered the following: "I shot [Smith.]"; "[Smith] is dead."; "I'm a murderer."; and "I had to shoot him before he shot me."

Respondent was indicted for murder and possession of a weapon during the commission of a violent crime.[4] Subsequently, Respondent filed a motion to dismiss the charges against him pursuant to the Protection of Persons and Property Act, §§ 16–11–410 to –450 (the Act). On October 2 and 3, 2012, the circuit court conducted a hearing on the motion. After receiving all of the evidence, the circuit court took the motion under advisement. The circuit court later sent a letter to the Solicitor and Respondent's counsel, advising them of the court's decision to grant the motion to dismiss and explaining the grounds for granting the motion.

On November 19, 2012, the Solicitor filed a written request for reconsideration. However, on January 4, 2013, the circuit court issued a formal order granting Respondent immunity from prosecution and dismissing the charges against him. The circuit court found Respondent showed by a preponderance of the evidence that, when he shot Smith, he was acting in self-defense because he reasonably believed it was necessary to use deadly force to prevent death or great bodily harm to himself. This appeal followed.

### ISSUES ON APPEAL

1. Did the circuit court abuse its discretion in finding Respondent reasonably believed shooting Smith was necessary to prevent great bodily injury to himself?

---

4. There is no indictment in the record. However, the circuit court referenced an indictment at the conclusion of its order granting immunity.

2. Did the circuit court err in admitting into evidence the testimony of two police officers concerning Smith's prior bad acts?

3. Did the circuit court abuse its discretion in assessing the evidence of Smith's intoxication and failing to properly assess Respondent's intoxication?

4. Did the circuit court err in granting Respondent immunity from prosecution pursuant to S.C.Code Ann. § 16–11–440(C)?

## STANDARD OF REVIEW

 This court reviews the trial court's pretrial determination of immunity for an abuse of discretion. *State v. Curry,* 406 S.C. 364, 370, 752 S.E.2d 263, 266 (2013). The admission or exclusion of evidence is also subject to an abuse of discretion standard of review. *See State v. Adams,* 354 S.C. 361, 377, 580 S.E.2d 785, 793 (Ct.App.2003) ("A court's ruling on the admissibility of evidence will not be reversed on appeal absent an abuse of discretion....")."An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *State v. Pittman,* 373 S.C. 527, 570, 647 S.E.2d 144, 166–67 (2007). In other words, the abuse of discretion standard of review does not allow this court to reweigh the evidence or second-guess the trial court's assessment of witness credibility. *Cf. State v. Mitchell,* 382 S.C. 1, 4, 675 S.E.2d 435, 437 (2009) (equating the "any evidence" standard of review in criminal cases to the abuse of discretion standard of review and emphasizing that, under this standard, the appellate court "does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial court's ruling is supported by any evidence").

## LAW/ANALYSIS

### I. Reasonable Belief

The State argues the circuit court abused its discretion in finding Respondent reasonably believed shooting Smith was

necessary to prevent great bodily injury to himself. We disagree.

Section 16–11–450(A) of the South Carolina Code provides immunity from criminal prosecution to a person using deadly force as permitted by the Act or another applicable provision of law.[5] Further, section 16–11–440 sets forth the circumstances under which the Act allows deadly force. The statute provides, in pertinent part:

(A) A person is presumed to have a reasonable fear of imminent peril of death or great bodily injury to himself or another person when using deadly force that is intended or likely to cause death or great bodily injury to another person if the person:

(1) against whom the deadly force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcibly entered a *dwelling, residence, or occupied vehicle,* or if he removes or is attempting to remove another person against his will from the dwelling, residence, or occupied vehicle; and

(2) who uses deadly force knows or has reason to believe that an unlawful and forcible entry or unlawful and forcible act is occurring or has occurred.

. . .

(C) A person who is not engaged in an unlawful activity and who is attacked in *another place* where he has a right to be, including, but not limited to, his place of business, has no duty to retreat and has the right to stand his ground and meet force with force, including deadly force, if he reasonably believes it is necessary to prevent death or great bodily injury to himself or another person or to prevent the commission of a violent crime as defined in Section 16–1–60.

S.C.Code Ann. § 16–11–440(A), (C) (emphases added). Section 16–11–430(2) defines "great bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of a bodily member or organ." In the present case, Respondent sought, and was granted, immu-

---

5. An exception exists if the person against whom deadly force was used is a law enforcement officer. *Id.*

nity under subsection (C) rather than subsection (A), as Smith was initially a social guest in Respondent's home.

■■■■ Our supreme court has recently emphasized that immunity under the Act "is predicated on an accused demonstrating the elements of self-defense to the satisfaction of the trial court by the preponderance of the evidence," save the duty to retreat. *Curry*, 406 S.C. at 371–72, 752 S.E.2d at 266–67. "[A] valid case of self-defense must exist, and the trial court must necessarily consider the elements of self-defense in determining a defendant's entitlement to the Act's immunity." *Id.* at 371, 752 S.E.2d at 266.

> There are four elements required by law to establish a case of self-defense:

> First, the defendant must be without fault in bringing on the difficulty. Second, the defendant must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger. Third, if his defense is based upon his belief of imminent danger, a reasonably prudent man of ordinary firmness and courage would have entertained the same belief. If the defendant actually was in imminent danger, the circumstances were such as would warrant a man of ordinary prudence, firmness and courage to strike the fatal blow in order to save himself from serious bodily harm or losing his own life. Fourth, the defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance.

*Id.* at 371 n. 4, 752 S.E.2d at 266 n. 4 (citation omitted). Again, the last element, i.e., the *duty to retreat*, need not be shown when seeking immunity under the Act. *Id.* at 371, 752 S.E.2d at 266.

In *Curry,* our supreme court affirmed the circuit court's denial of the accused's motion to dismiss pursuant to section 16–11–440(C). *Id.* at 370, 752 S.E.2d at 266. The court noted that the testimony of the accused and the State's witnesses varied "substantially." *Id.* at 369, 752 S.E.2d at 265. After reciting the facts of the case, the court stated "Appellant's claim of self-defense presents a quintessential jury question." *Id.* at 372, 752 S.E.2d at 267.

Likewise, in *State v. Butler*, our supreme court affirmed the circuit court's denial of the accused's motion for a directed verdict on self-defense, concluding that the evidence created a jury issue on the question of self-defense. 407 S.C. 376, 382, 755 S.E.2d 457, 460–61 (2014). The court noted that the accused presented various inconsistent accounts of how her stabbing of the victim occurred. *Id.* at 382, 755 S.E.2d at 460. The court also noted that the accused's injuries were not consistent with her testimony that the victim struck her in the head with a DVD/VCR player, punched and kicked her, and choked her into unconsciousness. *Id.*

 Unlike *Curry* and *Butler*, here, the circuit court found by a preponderance of the evidence that (1) Respondent reasonably believed shooting Smith was necessary to prevent great bodily injury to himself, and (2) Respondent acted in self-defense. The evidence supports these findings. Respondent presented several photographs showing severe bruising on Respondent's upper arms, a black eye, a scraped knee, and several marks on his legs and chest.

Additionally, several of the State's witnesses presented forensic evidence in the form of blood spatters from the scene, gunshot residue, Smith's autopsy, and Smith's blood-alcohol level.[6] All of this objective evidence was consistent with Respondent's testimony concerning the events leading up to the shooting. Specifically, gunshot residue was found on Smith's left palm, indicating that Smith was within close proximity of the pistol when it was fired. There was stippling around Smith's gunshot wound. According to the State's expert in trace evidence, the presence of stippling indicated that Smith was within two feet of the pistol's muzzle. Blood spattering was found five to seven feet from Smith's head on the kitchen floor, and blood transfer stains were found on the island separating the kitchen from the dining room, also five to seven feet from Smith. This evidence is consistent with Respondent's testimony that Smith was in the kitchen when Respondent shot him.

 Further, Smith's autopsy revealed that the bullet pierced the left side of Smith's chest, traveling through the

---

6. Law enforcement did not obtain a blood-alcohol level for Respondent.

heart and backward and downward to the right side of his back. As observed by the circuit court, this information established that Smith was facing Respondent when the pistol fired. Moreover, the post-mortem report showed that Smith's blood-alcohol level was 0.216 and the level of alcohol found in Smith's ocular fluid was 0.24. The toxicologist who prepared the report testified that a level of 0.216 can cause "severe aggression, emotional instability, [and] violence" for an experienced drinker. Deputy Wallace testified that he knew Smith was a heavy drinker.[7]

In its order granting immunity, the circuit court stated it discounted the portions of Respondent's testimony that were either self-serving or subjective and instead relied on the objective evidence and testimony of other witnesses. The court also noted that it looked to the evidence at the scene to objectively assess Respondent's testimony. The court ultimately found Respondent's testimony credible because it was consistent with the forensic evidence at the scene and other evidence in the case. As to the evidence of injuries to Respondent and Smith, the court found:

> [Respondent] fared much worse in the altercation prior to the fatal shot, and because Smith had no incapacitating wounds prior to that shot, [Respondent's] claimed belief that serious additional injury was about to be inflicted upon him if he did not act to protect himself was reasonable, and is supported by the evidence in this case.

The court also took into account Smith's previous attack of Respondent in the summer of 2006. This attack occurred in Smith's home-Respondent "uttered the expletive 'G * * d * * *,' upon which Smith 'snapped' and became violent, slamming [Respondent] against the pantry door" while choking him.

---

7. The circuit court addressed the State's concern that Respondent's intoxication was not taken into consideration by noting that law enforcement failed to measure Respondent's blood-alcohol level. See infra Issue III. While Respondent's intoxication was generally relevant to the case, we note the standard for evaluating whether an accused had a reasonable belief that deadly force was necessary to prevent great bodily harm to himself is objective, rather than subjective. The circuit court implicitly found that a reasonable, sober person facing the circumstances Respondent faced would have believed shooting Smith was necessary to prevent great bodily harm to himself and, thus, Respondent's belief that deadly force was necessary was reasonable.

Smith's mother and sister had to pull Smith off of Respondent. The circuit court noted that Respondent's testimony regarding this attack was not disputed by Smith's mother or sister, who were present in the courtroom during the hearing but not called by the State to testify. Curiously, the State argues there was "no indication based upon the prior interaction between Respondent and Smith that Smith would inflict great bodily injury." Smith's choking of Respondent and the need for Smith's mother and sister to pull Smith off of Respondent refute this argument.

We note the circuit court did not directly address the first element of self-defense, i.e., whether the accused was without fault in bringing on the difficulty. *See Curry,* 406 S.C. at 371 n. 4, 752 S.E.2d at 266 n. 4; *State v. Slater,* 373 S.C. 66, 70, 644 S.E.2d 50, 52 (2007) ("Any act of the accused in violation of law and reasonably calculated to produce the occasion amounts to bringing on the difficulty and bars the right to assert self-defense." (quoting *State v. Bryant,* 336 S.C. 340, 345, 520 S.E.2d 319, 322 (1999))). The circuit court merely stated that Respondent was not engaged in any unlawful activity at the time of the incident. Nonetheless, the evidence supports the circuit court's implicit finding that Respondent was without fault in bringing on the difficulty.[8]

Respondent's testimony indicates that Smith's violent behavior was an unreasonable reaction to a reasonable demand for Smith to return Respondent's medicine. Further, after Smith attacked Respondent and Respondent retreated to his bedroom, Respondent's reappearance at the kitchen's threshold with a loaded pistol by his side was lawful, as he had a right to defend his home and demand that Smith leave. *See*

---

8. Given Respondent's previous violent experience with Smith in the summer of 2006, perhaps Respondent should have known that sharing almost two full bottles of vodka with Smith was a bad idea. However, Respondent's condonation of, and participation in, this drinking binge did not amount to "bringing on the difficulty." "One who merely does an action [that] affords an opportunity for conflict is not thereby precluded from claiming self-defense. Fault implies misconduct, not lack of judgment." 40 Am.Jur.2d *Homicide* § 146 n. 6 (2008) (citing *State v. Jackson,* 94 Ariz. 117, 382 P.2d 229, 232 (1963)); *Jackson,* 382 P.2d at 232 ("Before an act may cause forfeiture of the fundamental right of self-defense it must be willingly and knowingly *calculated to lead to conflict."* (emphasis added)).

*State v. Rye,* 375 S.C. 119, 123, 651 S.E.2d 321, 323 (2007) ("As the defense of habitation provides, defending one's home or premises means ending an unwarranted intrusion through the use of reasonably necessary means of ejection." (citing *State v. Bradley,* 126 S.C. 528, 533, 120 S.E. 240, 242 (1923))); *Bradley,* 126 S.C. at 533, 120 S.E. at 242 ("A man who attempts to force himself into another's dwelling, or who, *being in the dwelling by invitation or license refuses to leave when the owner makes that demand, is a trespasser. . . .*" (emphasis added)); *cf. State v. Dickey,* 394 S.C. 491, 499–501, 716 S.E.2d 97, 101–02 (2011) (concluding that the accused, an armed security guard for an apartment complex, was without fault in bringing about the difficulty as a matter of law because he was exercising his right to eject trespassers in good faith).

In sum, the evidence supports the circuit court's finding that Respondent reasonably believed shooting Smith was necessary to prevent great bodily harm to himself as well as the finding that Respondent acted in self-defense. Therefore, the circuit court did not abuse its discretion in making these findings.

## II. Admission of Police Officers' Testimony

The State contends the circuit court abused its discretion in admitting the testimony of Officer William Stair, of the Myrtle Beach Police Department, and Sergeant Roy Drake, of the Cheraw Police Department, involving specific instances of Smith's violent conduct in 2007 and 2010, respectively. The State argues that neither incident was directed at Respondent or closely connected with Respondent's shooting of Smith and, therefore, this testimony was inadmissible character evidence.

*Preservation*

Respondent argues the State failed to preserve this issue for review because (1) the State did not object to the disputed testimony after the circuit court conditionally heard it; and (2) at trial, the State objected to the testimony on the ground of relevance only. We disagree.

We do not view the circuit court's rulings as conditional. Further, the circuit court was sufficiently apprised of the Solicitor's continuing objections such that it had an opportunity to consider and rule on them before issuing its order

granting immunity. *See Hubbard v. Rowe,* 192 S.C. 12, 19, 5 S.E.2d 187, 189 (1939) ("[A]ll that this [c]ourt has ever required is that the questions presented for its decision must first have been fairly and properly raised in the lower [c]ourt and passed upon by that [c]ourt."). Moreover, the State's objections at trial adequately covered both relevance and improper character evidence to the extent the evidence went beyond what Respondent had already referenced in his own testimony.[9]

"Error preservation rules do not require a party to use the exact name of a legal doctrine in order to preserve an issue for appellate review." *State v. Brannon,* 388 S.C. 498, 502, 697 S.E.2d 593, 595 (2010). Therefore, the State sufficiently preserved the issue of improper character evidence to the extent it went beyond Respondent's testimony.

*Merits*

Rule 404(a)(2), SCRE, provides, in pertinent part:

Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except ... [e]vidence of a pertinent trait of character of the *victim* of the crime offered by an accused, or by the prosecution to rebut the same....

(emphasis added).

Further, Rule 404(b), SCRE, states:

Evidence of other crimes, wrongs, or acts is not admissible *to prove the character of a person in order to show action in conformity therewith.* It may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent.

(emphasis added). Moreover, Rule 405, SCRE, addresses the following methods of proving character:

(a) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by

9. During his colloquy with the circuit court, the Solicitor stated, "I have no objection to [Respondent] testifying to what his understanding of the history of Mr. Smith was. I do object to this officer now telling the [c]ourt something that he did not tell [Respondent]."

testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an *essential element of a* charge, claim, or *defense,* proof may also be made of specific instances of that person's conduct.

(emphases added). However,

[i]n the murder prosecution of one pleading self-defense against an attack by the deceased, evidence of other *specific instances of violence* on the part of the deceased are not admissible unless they were directed against the defendant or, if directed against others, were so closely connected at point of time or occasion with the homicide as reasonably to indicate *the state of mind of the deceased at the time of the homicide, or to produce reasonable apprehension of great bodily harm.*

*State v. Day,* 341 S.C. 410, 419–20, 535 S.E.2d 431, 436 (2000) (emphases added) (citations omitted). "Whether a specific instance of conduct by the deceased is closely connected in point of time or occasion to the homicide so as to be admissible is in the trial [court's] discretion and will not be disturbed on appeal absent an abuse of discretion resulting in prejudice to the accused." *Id.* at 420, 535 S.E.2d at 436. In *Day,* our supreme court held evidence of a specific instance of the victim's violent behavior that occurred only four months prior to the victim's death was admissible to prove the accused had a reasonable apprehension of violence from the victim. *Id.* at 421, 535 S.E.2d at 437.

██ Here, the testimony to which the State objected showed that, in 2007, Officer Stair and another officer arrested Smith for public intoxication, disorderly conduct and resisting arrest. After being placed in a jail cell, Smith tried to damage the cell's lights. When Officer Stair and three other officers tried to move Smith to a different location, Smith refused to walk where officers directed him to go, requiring the officers to drag him. In preparing to remove Smith's handcuffs, the officers asked him to kneel down. However, Smith refused to do so and locked his knees. As the officers placed him on the ground to remove his handcuffs, Smith started struggling and

attempted to bite Officer Stair on his leg. Consequently, officers charged Smith with assaulting a police officer, to which he later pled guilty.

Later in the trial, Sergeant Drake testified that Smith was arrested in 2010 for assault after he bit a woman on her shoulder. When he arrived at the jailhouse, Smith was "highly intoxicated" and "sobbing about his deceased sister." As police officers processed Smith, they removed his sister's bracelet from his arm. Smith became distraught and angry, requiring the officers to forcibly place him in his jail cell. Smith then "charged back at" the officers.

The circuit court admitted Officer Stair's and Sergeant Drake's testimony into evidence on the grounds that it was relevant to Smith's state of mind and Respondent's state of mind at the time of the shooting and it was cumulative to Respondent's previous testimony referencing the two incidents. Respondent previously testified that, prior to the shooting, he was aware of these incidents as well as other, more serious instances of Smith's violence:

Q. Did you have on the day this happened, and I believe this was May 31, 2011. Did you have any knowledge in regard to [Smith's] propensity for violence?

A. Oh, yes, sir.

Q. Would you tell the [j]udge the knowledge that you had in regard to his propensity for violence?

A. *I knew that he had a history of violence in the past, and that he could be unpredictable, and violent, and aggressive.*

Q. Did you know that he had a criminal history of violent acts?

A. Oh, yes, sir.

Q. Can you describe the criminal history that you knew he had in regard to violent activity?

A. *Burglary, armed robbery, assaulting a woman, assaulting two police officers, and I know that he had a[n] upcoming charge against him for some sort of criminal sexual misconduct.*

Q. That was pending in the [c]ourt at the time he passed away?

A. Yes, sir.

. . .

Q. All right. At any time in the past, had [Smith] ever assaulted you?

A. Yes, sir.

Q. How many years ago was it that [Smith] actually assaulted you?

A. It would have been somewhere around the summer of 2006.

Q. Where did that assault take place?

A. In the home of his parents.

Q. Would you tell the [j]udge what he had done when he assaulted you approximately [five years] before this happened?

A. *He had thrown me up against, as I remember, the pantry door, and strangled me, started choking me.* He stopped because his sister and mother[,] crying[,] pulled him off.

Q. What had provoked that attack?

A. I . . . said, [G] * * d * * *.

Q. And when you said that, what did he do?

A. He snapped.

(emphases added).

Therefore, the fact that Smith had a history of violent behavior was well-established—without objection from the State—prior to the admission of Sergeant Drake's and Officer Stair's testimony. Any error in admitting details of the 2007 and 2010 incidents beyond what Respondent already knew was harmless. *See State v. Williams,* 321 S.C. 455, 463, 469 S.E.2d 49, 54 (1996) (holding improperly admitted testimony was cumulative to the other, properly admitted evidence and was therefore harmless).

### III. Assessment of Intoxication Evidence

The State asserts the circuit court erred in assessing the evidence of Smith's intoxication and Respondent's intoxication, arguing that these errors require this court to vacate the

corresponding findings and the order granting immunity. We disagree.

Specifically, the State maintains that the circuit court's reliance on the testimony of the toxicologist, Shana Sorrells, was misplaced. The State argues that Sorrells testified she did not know how Smith would behave with a 0.216 blood-alcohol level, and the circuit court attributed to her testimony the statement that such a level "would *most probably* lead to aggressive and violent behavior." (emphasis added). The circuit court actually stated: "According to the testimony of toxicologist Shanna B. Sorrells of SLED, such a level of intoxication would most probably lead to aggressive and violent behavior, emotional instability, and mood swings." The circuit court then stated: "This behavioral evidence bears directly upon the issue of [Respondent's] claimed belief of being in imminent fear of serious bodily harm requiring the use of deadly force for his protection."

On direct examination, Sorrells stated that a blood-alcohol level of 0.216 can cause "severe aggression, emotional instability, [and] violence" for an experienced drinker. She also stated, "[Y]ou would definitely see some severe mood swings" in an experienced drinker with a 0.216 blood-alcohol level. On cross-examination, Sorrells stated, "[I]t has been shown that usually at that level you do see increased agitation and mood swings." Sorrells then admitted "that does not occur in everybody, that is just *on average*." (emphasis added). Sorrells also admitted she did not know how much experience Smith had with drinking.

We recognize that Sorrells' indication of "on average" does not equate with the circuit court's indication of "most probably." But while the circuit court may have overlooked or slightly misstated Sorrells' testimony under cross-examination, her actual testimony that a blood-alcohol level of 0.216 *can* cause severe aggression, emotional instability, and violence for an experienced drinker still provided support for the circuit court's recognition of this testimony as relevant to Smith's aggressive behavior prior to the shooting. Further, there was ample additional evidence of Smith's tendency toward aggression. In addition to the choking incident in 2006, Respondent recounted his knowledge of Smith's history of "[b]urglary,

armed robbery, assaulting a woman," and "assaulting two police officers." Therefore, any inaccuracy in the circuit court's characterization of Sorrells' testimony did not prejudice the State.

The State further maintains the circuit court erred in not considering Respondent's intoxication, arguing Respondent's behavior before and during the shooting indicates his judgment was impaired by the alcohol he consumed that day. However, the standard for evaluating whether an accused had a reasonable belief that deadly force was necessary is an objective standard. *See Curry*, 406 S.C. at 371 n. 4, 752 S.E.2d at 266 n. 4 (setting forth the elements of self-defense and stating "if his defense is based upon his belief of imminent danger, a *reasonably prudent man* of ordinary firmness and courage would have entertained the same belief" (emphasis added)). Further, the circuit court implicitly found that a reasonable, sober person facing Respondent's circumstances would have believed shooting Smith was necessary to prevent great bodily harm to himself and, thus, Respondent's same belief was reasonable.

The circuit court also noted that law enforcement did not obtain a specific blood-alcohol level for Respondent, despite the fact that Respondent was in police custody. Therefore, the circuit court appropriately declined to attribute any aggressive behavior to Respondent at the time of the shooting.

Based on the foregoing, the circuit court did not commit reversible error in assessing the evidence of Smith's and Respondent's intoxication.

### IV. Location of Homicide

The State argues that a finding of immunity may not be made pursuant to section 16-11-440(C) unless the location of the homicide was a place other than the accused's residence or vehicle. We disagree.

"All rules of statutory construction are subservient to the one that the legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute." *Broadhurst v. City of Myrtle Beach Election*

*Comm'n,* 342 S.C. 373, 380, 537 S.E.2d 543, 546 (2000) (citation omitted). On the other hand, "[h]owever plain the ordinary meaning of the words used in a statute may be, the courts will reject that meaning when to accept it would lead to a result so plainly absurd that it could not possibly have been intended by the Legislature or would defeat the plain legislative intention." *Id.* "If possible, the court will construe the statute so as to escape the absurdity and carry the intention into effect." *Id.* Stated another way, "[a] statute as a whole must receive practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of lawmakers," and "the language of the statute must be read in a sense that harmonizes with its subject matter and accords with its general purpose." *Sparks v. Palmetto Hardwood, Inc.,* 406 S.C. 124, 128, 750 S.E.2d 61, 63 (2013) (citation and quotation marks omitted).

Section 16–11–440 provides, in pertinent part:

(A) A person is presumed to have a reasonable fear of imminent peril of death or great bodily injury to himself or another person when using deadly force that is intended or likely to cause death or great bodily injury to another person if the person:

(1) against whom the deadly force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcibly entered a *dwelling, residence, or occupied vehicle,* or if he removes or is attempting to remove another person against his will from the dwelling, residence, or occupied vehicle; and

(2) who uses deadly force knows or has reason to believe that an unlawful and forcible entry or unlawful and forcible act is occurring or has occurred.

. . .

(C) A person who is not engaged in an unlawful activity and who is attacked in *another* place where he has a right to be, including, *but not limited to,* his place of business, has no duty to retreat and has the right to stand his ground and meet force with force, including deadly force, if he reasonably believes it is necessary to prevent death or great bodily

injury to himself or another person or to prevent the commission of a violent crime as defined in Section 16–1–60.

§ 16–11–440(A), (C) (emphases added).

The State places emphasis on the word "another" in the phrase "another place where [the accused] has a right to be" in subsection (C) of section 16–11–440. The primary definition of "another" is "different or distinct from the one first considered." *Merriam Webster's Collegiate Dictionary* 51 (11th ed. 2003). This definition would arguably modify "place," as used in section 16–11–440(C), in such a way as to make "dwelling, residence, or occupied vehicle" and "another place" mutually exclusive. This is the interpretation the State proposes. On the other hand, the second and third definitions of "another" are "some other" and "being one more in addition to one or more of the same kind," respectively. *Id.* The third definition is more inclusive and arguably would *not* eliminate "dwelling, residence, or occupied vehicle" as a possible "place" where the person using deadly force has a right to be pursuant to section 16–11–440(C).

 "Words in a statute must be construed in context." *Sparks,* 406 S.C. at 128, 750 S.E.2d at 63 (citation and quotation marks omitted). "Thus, the [c]ourt may not, in order to give effect to particular words, virtually destroy the meaning of the entire context; that is, give the particular words a significance [that] would be clearly repugnant to the statute, looked at as a whole, and destructive of its obvious intent." *Id.* at 129, 750 S.E.2d at 63 (citation and quotation marks omitted). Notably, the General Assembly expressly set forth its intent for the Act in section 16–11–420 as follows:

(A) It is the intent of the General Assembly to codify the common law Castle Doctrine which recognizes that a person's home is his castle *and to extend the doctrine to include* an occupied vehicle and *the person's place of business.*

(B) The General Assembly finds that it is proper for law-abiding citizens to protect themselves, their families, and others from intruders *and attackers* without fear of prosecution or civil action for acting in defense of themselves and others.

(C) The General Assembly finds that Section 20, Article I of the South Carolina Constitution guarantees the right of the people to bear arms, and this right shall not be infringed. (D) The General Assembly finds that persons residing in or visiting this State have a right to expect to remain unmolested *and safe within their homes, businesses, and vehicles.*

(E) The General Assembly finds that no person or victim of crime should be required to surrender his personal safety to a criminal, nor should a person or victim be required to needlessly retreat in the face of intrusion *or attack.*

(emphases added).

The General Assembly's use of this language in section 16–11–420 clearly indicates its intent to provide the protections of the Act to persons within their own home facing not only unwelcome intruders but also "attackers," including those who are initially invited into the home and later place the homeowner in reasonable fear of death or great bodily injury. Further, the language of section 16–11–440(C) itself indicates that its application is not limited to businesses. Therefore, the more inclusive definition of "another" is the proper definition to employ in interpreting section 16–11–440(C). *See Sparks,* 406 S.C. at 128, 750 S.E.2d at 63 ("A statute as a whole must receive practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of lawmakers." (citation and quotation marks omitted)); *Broadhurst,* 342 S.C. at 380, 537 S.E.2d at 546 ("All rules of statutory construction are subservient to the one that the legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute." (citation omitted)).

Based on the foregoing, the circuit court correctly interpreted section 16–11–440(C) to apply to Respondent.

## CONCLUSION

For the foregoing reasons, we affirm the circuit court's order granting Respondent immunity from prosecution.

**AFFIRMED.**

WILLIAMS and McDONALD, JJ., concur.