**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
In The Court of Appeals

The State, Respondent,

v.

Eugene Turner, Jr., Appellant.

Appellate Case No. 2022-001287

―――――――――

Appeal From Greenville County
Perry H. Gravely, Circuit Court Judge

―――――――――

Unpublished Opinion No. 2025-UP-258
Heard March 6, 2025 – Filed July 23, 2025

―――――――――

**AFFIRMED**

―――――――――

Miles Edward Coleman and Adam Blake McCoy, both of
Nelson Mullins Riley & Scarborough, LLP, of
Greenville; and Chief Appellate Defender Robert
Michael Dudek, of Columbia, all for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Joshua Abraham Edwards, both of
Columbia; and Solicitor Cindy S. Crick, of Greenville, all
for Respondent.

―――――――――

**PER CURIAM:**  Eugene Turner appeals his convictions for attempted murder, three counts of assault and battery, and possession of a weapon during the commission of a violent crime, along with his aggregate sentence of eighteen years' imprisonment.  On appeal, Turner argues the trial court erred by (1) denying his motion for immunity under the South Carolina Protection of Persons and Property Act[1] (the Act) and (2) denying his motion for a mistrial.  We affirm.

These charges arose from a shooting at a Greenville bar called the Dugout.  Turner fired several rounds into a car occupied by four victims—Daniel Stokes, Angela Anderson, Kimberly Pickens, and Nichrisha Rosemond—and attempted to fire at a fifth victim, Christine Wolfe-Young, who was standing nearby.  Turner moved for immunity pursuant to the Act, and the trial court held a pretrial hearing.

At the hearing, Turner presented evidence that he and Stokes had a volatile relationship stemming from their involvement with a woman named Monique Fletcher.  Stokes and Fletcher had previously been in a relationship and had a daughter together.  In August 2013, Stokes and Turner got into an altercation over "family issues" involving Stokes's daughter.  Stokes was convicted of malicious injury to personal property for damaging Turner's car during the incident.  Then, in December 2016, Stokes's daughter reported that Turner had touched her inappropriately; the Greenville County Sheriff's Office investigated and no charges were filed.

As a result of this incident, Stokes and the other victims began making threatening Facebook posts directed at Turner.  In the comments on a post on Wolfe-Young's page on January 9, 2017, Anderson wrote that Turner "better go have several seats."  Rosemond then commented that if Turner knew "whats (sic) best [he] will go get a life and sit down because we RIDE IN PACKS AND RIDE FOR OURS . . . . ANYTIME ANYDAY (sic) ANY HOUR FACTZ (sic)."  On January 13, 2017, Stokes wrote:

> His name is Eugene Turner!!!  If you see this bitch
> ass child malester (sic) call the police before I get to
> hem (sic) because on my family and life he done all
> my n***as green light mash on sight!!  It's face off
> f*ck boy not god, not my mama, not Police, not your
> mama can save you on the Shao u dead bitch!!!

---

[1] S.C. Code Ann. §§ 16-11-410 to -450 (2015).

The post was accompanied by a picture of Turner.

Wolfe-Young shared the post on January 14, writing that she was "giving [the situation] to God because if the law don't get you[,] the streets will." The same day, she wrote another post seemingly addressing Turner—though not naming him directly—stating, "You Can Run But I Promise You Can't Hide For Long (sic)." That post was also accompanied by pictures of Turner. Then, on January 17, 2017, Wolfe-Young shared a video from Stokes's page with the caption, "Georgia Boy Turner . . . . You Did The Crime, You Gotta Do The Time (sic)."[2] Stokes did not name Turner directly in the video but addressed him obliquely, saying, "Can't nobody save you ni**a. You better pray to Allah, Buddha, and Shania Twain, [be]cause bitch I'm coming."

Turner testified that Wolfe-Young "tagged" him in all of the posts she made about him, ensuring that he received notifications to view the posts. Turner testified the posts "terrified" him, and he felt threatened. There were no further posts after January 2017.

On September 1, 2017, Turner went to the Dugout in Greenville, where he encountered Fletcher at the bar.[3] He stated that when he went outside to the parking lot to relieve himself, Stokes ran up behind him and shouted, "What's up, pussy ni**er." According to Turner, when he realized who was speaking, he "jumped in [his] car, reached in [his] pocket, and grabbed the pistol," which he immediately cocked. He testified Stokes "seemed like he was fidgeting with something," and because he did not know what Stokes was doing, he shot. Turner stated that when he heard Stokes's voice, he thought Stokes "was fixing to hurt [him]" or he was going to hurt Stokes.[4] Turner further stated that when Stokes saw

---

[2] Turner testified that he used the name "Georgia Boy Turner" for his Facebook profile at that time.

[3] Turner acknowledged that he knew Fletcher would be at the Dugout because she had posted on Facebook, and he was also aware any of the victims could have been there with her.

[4] We note that Turner's version of events was convoluted and often contradictory. For example, at one point, Turner testified he never fired at the car, he was firing at Stokes. However, in answering the next question, Turner testified he "shot the car right there in the Dugout parking lot." Additionally, during the course of his testimony, he first claimed that Stokes approached him from behind, but later claimed multiple times to have seen Stokes getting out of the car and coming

him pull the gun, Stokes "turned back and ran" back to his car. Further, Turner acknowledged that Stokes was backing up his car, "trying to get up out of [the parking lot]" when he fired his weapon. Turner testified he did not see anyone in the car with a gun and agreed that no one shot at him from the car.

Turner asserted he was "very" afraid when Stokes approached him;[5] however, when asked if he thought he was going to be seriously hurt or killed, Turner responded, "To a certain point, I did." Turner stated that after the shooting, he went home to Georgia because he felt safer there. He stayed in Georgia for one day before returning to his home in Greenville.

Cody Mitchell and Cameron Woody, two of the officers who responded to the scene, testified they collected statements from several of the victims, including Stokes, and located several nine-millimeter shell casings in the roadway in front of the Dugout; they did not find any shell casings in the parking lot. Stokes told the officers he received a call from Wolfe-Young, his sister, who was at the Dugout, stating that Turner was there, and she needed help. According to Stokes, when he arrived at the Dugout, Turner approached him and started shooting, advancing on the car Stokes was driving. Woody testified the victims pointed out damage to the passenger side and rear of the car.[6] He stated the damage to the rear of the car was located "on the very back of the vehicle as though it had been driving away." Mitchell testified Pickens gave a statement that Turner was in the road firing at them as they reversed their car back down the road, and Anderson stated Turner "pulled out a firearm and shot at their vehicle while they were in the vehicle." None of the victims in the car were injured.

The trial court took Turner's immunity motion under advisement and ultimately denied it. The court ruled that Turner had not met his burden of proving the elements of self-defense by a preponderance of the evidence due to inconsistencies in the record. It noted that it was required to make credibility findings and explained that "there [were] definitely some inconsistencies in the statements"

---

towards him. There were also inconsistencies between Turner's hearing testimony and his recorded statement to police.

[5] Turner testified that his fear stemmed in part from his physical condition, and due to a workplace accident several years earlier, he could "barely" move around and had pain and numbness in his feet.

[6] Woody and Mitchell both testified the vehicle did not have any bullet holes, but it appeared to have damage or marks that could have been caused by a ricochet or "possibly projectiles."

Turner made while testifying at the hearing when compared to his videotaped statement to police. Further, the court stated it had considered a 911 call made by Turner on the day of his arrest and observed that when Turner was asked during the call why he shot at the car, he did not say that he was scared or felt like he needed to defend his life.[7] The court also explained it felt there was an "issue of whether [Turner was] without fault in bringing about the difficulty," given that he knew Fletcher would be at the Dugout and any of the others could be with her. The trial court also stated that in analyzing the language of the Act, it did not feel Turner had presented evidence that "an attack had occurred sufficient enough to trigger that statute." Turner did not object to either the form or the substance of the ruling.

Immediately following the immunity ruling, the parties informed the trial court that they had resolved Turner's motion to exclude any reference to molestation or abuse when discussing the events involving Stokes's daughter prior to the shooting. They agreed they would not mention "molestation, or sex abuse, or inappropriate touching" and would instead refer to "a serious family incident involving a family member."

Stokes was the first witness at trial. The State asked him several questions about his relationships with Fletcher and Turner. Stokes referred to previous "difficulties" between himself and Turner over "discipline" of the children, without objection. The State then asked whether, prior to the shooting, he became aware of "a serious family incident involving a family member." Stokes answered affirmatively and stated that law enforcement had been involved but informed him that there was "no evidence yet" because "Mom" had not taken any action. At that point, Turner objected and moved for a mistrial. He argued Stokes's answer violated the stipulation because they had agreed not to discuss "kids" and Stokes had implied a child was involved because of the mention of "Mom."

The trial court sustained Turner's objection and stated the testimony was "getting very close" to the line but it did not rise to level of requiring a mistrial. Instead, the court offered to give a curative instruction "that anything not in evidence is to be stricken and [the jury is] not to consider it." Turner declined, stating he felt a curative instruction would only serve to "highlight the issue more." However, he

---

[7] The week after the shooting, Turner called 911 when officers arrived at his home to arrest him; he testified he called because he believed it could have been Stokes who was banging on his door. Turner entered the 911 call into evidence at the immunity hearing.

requested the court give a similar instruction at the end of trial, and the court replied that it usually did. The State then continued questioning Stokes.

The jury found Turner guilty of the attempted murder of Stokes and guilty of the lesser-included offense of first-degree assault and battery as to Pickens, Anderson, and Rosemond. It also convicted him of possession of a deadly weapon during the commission of a violent crime. Turner was acquitted as to the charges involving Wolfe-Young. The trial court sentenced him to an aggregate sentence of eighteen years' imprisonment.

## STANDARD OF REVIEW

"This [c]ourt reviews an immunity determination for abuse of discretion." *State v. Cervantes-Pavon*, 426 S.C. 442, 449, 827 S.E.2d 564, 567 (2019). "A [trial] court abuses its discretion when its ruling is based on an error of law, or when grounded in factual conclusions, is without evidentiary support." *Id.* "In other words, the abuse of discretion standard of review does not allow this court to reweigh the evidence or second-guess the trial court's assessment of witness credibility." *State v. Douglas*, 411 S.C. 307, 316, 768 S.E.2d 232, 237-38 (Ct. App. 2014). Further, the trial court is not required "'to accept the accused's version of the underlying facts' in determining a motion for immunity under the Act." *State v. Oates*, 421 S.C. 1, 13, 803 S.E.2d 911, 918 (Ct. App. 2017) (quoting *State v. Curry*, 406 S.C. 364, 371, 752 S.E.2d 263, 266 (2013)).

## IMMUNITY

### A. Evidence of an Attack on Turner

Turner argues the trial court abused its discretion in finding the Act was inapplicable because there was insufficient evidence that Turner was under attack. He cites to *State v. Dickey*, wherein our supreme court determined the defendant actually and reasonably believed he was in imminent danger of attack when the victim yelled obscenities at the defendant, approached rapidly, and appeared to be reaching for a weapon. 394 S.C. 491, 501-02, 716 S.E.2d 97, 102 (2011). Calling *Dickey* "functionally indistinguishable," Turner argues he was under attack because Stokes approached him from behind while "screaming profanities," came closer to him while making threats, and reached for what Turner believed to be a weapon. We disagree.

Pursuant to the Act,

> A person who is not engaged in an unlawful activity
> and who is attacked in another place where he has a
> right to be . . . has no duty to retreat and has the right
> to stand his ground and meet force with force,
> including deadly force, if he reasonably believes it
> is necessary to prevent death or great bodily injury
> to himself or another person . . . .

S.C. Code Ann. § 16-11-440(C) (2015). "A person who uses deadly force as permitted by the provisions of [the Act] . . . is immune from criminal prosecution . . . for the use of deadly force . . . ." S.C. Code Ann. § 16-11-450(A) (2015). "[Trial] courts utilize pretrial hearings to determine whether a defendant is entitled to immunity under the Act . . . ." *Cervantes-Pavon*, 426 S.C. at 449, 827 S.E.2d at 567. "Consistent with the Castle Doctrine and the text of the Act, a valid case of self-defense must exist, and the trial court must necessarily consider the elements of self-defense in determining a defendant's entitlement to the Act's immunity." *Curry*, 406 S.C. at 371, 752 S.E.2d at 266. "Therefore, the defendant must demonstrate the elements of self-defense, save the duty to retreat, by a preponderance of the evidence." *State v. Jones*, 416 S.C. 283, 301, 786 S.E.2d 132, 141 (2016). The remaining elements of self-defense are: (1) "the defendant must be without fault in bringing on the difficulty;" (2) "the defendant must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury;" and (3) "if his defense is based upon his belief of imminent danger, a reasonably prudent man of ordinary firmness and courage would have entertained the same belief." *Curry*, 406 S.C. at 371 n.4, 752 S.E.2d at 266 n.4. Additionally, "the [trial] court, sitting as fact-finder, must make specific findings that support its immunity decision." *State v. Ford*, 439 S.C. 261, 271, 886 S.E.2d 710, 715 (Ct. App. 2023).

In *Dickey*, the defendant was a security guard at an apartment complex who shot the victim while in the process of ejecting him from a resident's apartment. 394 S.C. at 495-97, 716 S.E.2d at 99-100. Dickey and the victim had no previous relationship, multiple witnesses testified Dickey remained calm throughout the interaction, and he only pulled his gun after the victim—who was heavily intoxicated—aggressively advanced toward him wielding a liquor bottle. *Id.* Here, the State presented evidence, through the testimony of the officers, that at least two of the victims contradicted Turner's version events and stated that he fired at them while they were in their car attempting to leave. Moreover, Turner himself acknowledged that Stokes was backing up his car, "trying to get up out of [the

parking lot]" when Turner fired his weapon.  Turner also testified he did not see anyone in the car with a gun and agreed that no one shot at him from the car.

The facts of this case are more similar to *Oates*.  In that case, this court upheld the trial court's denial of immunity when the defendant claimed he shot the victim during the victim's attempt to forcibly remove him from his vehicle.  421 S.C. at 9-10, 803 S.E.2d at 916.  The trial court found that even "[a]ssuming that there was an 'attack' previously, there was no such event at the time of the shooting," and therefore, "there was no force to be met." *Id.* at 16, 803 S.E.2d at 919.  This court upheld the trial court's finding, stating even if the victim had been intent on continuing the argument, that was "not necessarily inconsistent with the trial court's perception that the aggression *had abated at that precise moment*," and "it was unreasonable for [the defendant] to believe deadly force was necessary *at that particular point in time*." *Id.* (emphases added).  Moreover, "the abuse of discretion standard of review does not allow this court to reweigh the evidence or second-guess the trial court's assessment of witness credibility." *Douglas*, 411 S.C. at 316, 768 S.E.2d at 238.  Therefore, we hold the trial court correctly found that the Act did not apply because Turner failed to prove that he was under attack *at the time of the incident*, as required by the statute. *See* § 16-11-440(C) (stating "a person who is not engaged in an unlawful activity and *who is attacked* in [a] place where he has a right to be . . . has the right to stand his ground and meet force with force, including deadly force, if he reasonably believes it is necessary to prevent death or great bodily injury to himself or another person" (emphasis added)).

## B. Sufficiency of Trial Court's Factfinding

Turner next argues the trial court committed reversible error by failing to make specific findings as to each element of self-defense in analyzing his motion under the Act.  We disagree.

Turner did not object to either the form or the substance of the trial court's ruling, and thus, we question whether this issue is sufficiently preserved for this court's review. *See Queen's Grant II Horizontal Prop. Regime v. Greenwood Dev. Corp.*, 368 S.C. 342, 373, 628 S.E.2d 902, 919 (Ct. App. 2006) ("Issue preservation rules are designed to give the trial court a fair opportunity to rule on the issues, and thus provide us with a platform for meaningful appellate review."); *Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) (explaining that issue preservation requires that an issue be "raised to and ruled upon by the trial [court]").  Nonetheless, we hold the trial court made sufficient factual findings

regarding the elements of self-defense such that this court can fairly review the ruling. *See Curry*, 406 S.C. at 371, 752 S.E.2d at 266 ("[T]he trial court must necessarily consider the elements of self-defense in determining a defendant's entitlement to the Act's immunity."); *Ford*, 439 S.C. at 271, 886 S.E.2d at 715 (explaining that "the [trial] court, sitting as fact-finder, must make specific findings that support its immunity decision"). As detailed above, the court orally explained its reasoning in denying Turner's motion. Although it did not list each element of self-defense and specifically connect each finding to an element, we find the substance of the ruling sufficiently covered each element.

## C. Elements of Self-Defense

Turner argues the trial court abused its discretion in denying his immunity motion because its conclusion that he failed to prove the elements of self-defense is not supported by the record. We disagree.

First, the trial court found Turner's testimony "definitely [had] holes in the story," and we note "the abuse of discretion standard of review does not allow this court to reweigh the evidence or second-guess the trial court's assessment of witness credibility." *Douglas*, 411 S.C. at 316, 768 S.E.2d at 238. Further, the trial court is not required "'to accept the accused's version of the underlying facts' in determining a motion for immunity." *Oates*, 421 S.C. at 13, 803 S.E.2d at 918 (quoting *Curry*, 406 S.C. at 371, 752 S.E.2d at 266.).

Although Turner testified Stokes started the confrontation by approaching him from behind in the parking lot, the officers testified Stokes, Anderson, and Pickens stated Turner shot at them while they were in their car leaving the parking lot. Further, even crediting Turner's version of events, Turner himself acknowledged that when Stokes saw him pull the gun, Stokes "turned back and ran" to his car, and Stokes was backing up his car, "trying to get up out of [the parking lot]" when Turner fired his weapon. Moreover, the forensic evidence supported the passengers' version of events, not Turner's, as the officers only found shell casings in the road, not in the parking lot.

Additionally, Turner's testimony as to whether he feared for his life was equivocal; although he stated he was "very" afraid when he saw Stokes, when asked if he thought he was going to be seriously hurt or killed, Turner responded, "*To a certain point*, I did." On the 911 call, when asked why he shot at the car, he mentioned the history of conflict between himself and Stokes, but he never stated he was in fear of his life. Finally, although we acknowledge the threatening nature

of the Facebook posts and the 2013 incident that resulted in damage to Turner's car, Turner admitted he had not seen any posts since January 2017—almost eight months prior to the shooting—and Turner knew Fletcher was at the Dugout celebrating her birthday with friends and family, which could include Stokes and the other victims; yet, he chose to leave another bar to go to the Dugout instead. Accordingly, we find there was evidence in the record to support the trial court's determination that Turner failed to prove he was without fault in bringing on the difficulty, that he feared for his life or great bodily harm, or that a reasonable person in the same situation would entertain such a belief. *See Cervantes-Pavon*, 426 S.C. at 449, 827 S.E.2d at 567 (explaining that the trial court abuses its discretion only if "its ruling is based on an error of law, or when grounded in factual conclusions, is without evidentiary support"); *State v. Marshall*, 428 S.C. 11, 20, 832 S.E.2d 618, 623 (Ct. App. 2019) (upholding the trial court's finding that the defendant's "testimony was unreliable and prevented the court from finding [the defendant] established the relevant elements of self-defense by a preponderance of the evidence").

**MISTRIAL**

Turner argues the trial court erred by denying his motion for a mistrial. We hold this issue is not preserved for this court's review.

"When an objecting party is sustained, the trial court has rendered a favorable ruling, and therefore, it becomes necessary that the sustained party move to cure, or move for a mistrial if such a cure is insufficient, in order to create an appealable issue." *State v. Wilson*, 389 S.C. 579, 583, 698 S.E.2d 862, 864 (Ct. App. 2010). "Moreover, as the law assumes a curative instruction will remedy an error, failure to accept such a charge when offered, or failure to object to the sufficiency of that charge, renders the issue waived and unpreserved for appellate review." *Id.* The trial court sustained Turner's objection and offered to give a curative instruction, but Turner declined. Thus, we find Turner waived his objection. *See Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012) ("[W]e are not precluded from finding an issue unpreserved even when the parties themselves do not argue error preservation to us.").

**AFFIRMED.**

**WILLIAMS, C.J., and GEATHERS and TURNER, JJ., concur.**