800 S.E.2d 793

**The STATE, Appellant,**

**v.**

**Shannon SCOTT, Respondent.**

**Appellate Case No. 2013-002124**
**Opinion No. 5483**

Court of Appeals of South Carolina.

Heard September 8, 2016
Filed May 3, 2017
Rehearing Denied June 29, 2017

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy

Attorney General Donald J. Zelenka, Assistant Attorney General Alphonso Simon, Jr., Solicitor Daniel Edward Johnson, all of Columbia, for Appellant.

Chief Appellate Defender Robert Michael Dudek, of Columbia, for Respondent.

KONDUROS, J.:

The State appeals the circuit court's finding Shannon Scott was immune from prosecution for the murder of Darrell Niles (Victim) based on section 16-11-440(A) and (C) of the South Carolina Code (2015). The statute codifies the common law "Castle Doctrine" and "Stand Your Ground" defenses, respectively.[1] We affirm as modified.

## FACTS/PROCEDURAL BACKGROUND

On the night of April 17, 2010, Scott's teenage daughter, Shade, went to a party at a teen club in Columbia accompanied by Rosalyn Fuller's teenage daughters, Ashley, Asia, and Ave, and two other friends, Denzel D. and Antonio B. Fuller was with Scott at his home in Columbia, and the teens were to return to Fuller's home after they left the club.[2]

During and shortly after the party, Shade was involved in a confrontation with another girl, Teesha D. Shade's group left the club in a 1993 Grand Marquis driven by Denzel. They were followed by a group of females, including Teesha, in a silver Ford Expedition sport utility vehicle (SUV). The SUV chased the Grand Marquis, following it down numerous streets and into different neighborhoods. During the chase, Shade called her father and told him they were being followed by a group of girls with a gun. Ashley texted and then called her mother to say they were being followed by Teesha.[3] The teens were instructed to drive to Scott's home.

Apparently, unbeknownst to the two groups, a third vehicle, a burgundy Honda, was following the chase from a bit of a

---

1. Sections 16-11-410 to -450 (2015) are known as the Protection of Person and Property Act (the Act).

2. Scott was engaged to Fuller at the time of the incident.

3. According to testimony in the record, a dispute had been ongoing between Shade and Teesha.

distance. Victim was driving the Honda, and Eric W. was a passenger. According to Eric, Victim wanted to ensure the girls in the Grand Marquis got home safely.

When the group arrived at Scott's house, they pulled the Grand Marquis into the backyard and, at Fuller and Scott's instruction, entered the house through the back door and into the kitchen. Testimony as to these and subsequent events is conflicting, but the record demonstrates the SUV drove by Scott's house, turned around, and drove back by the house with its lights off. The Honda was also in close proximity to Scott's house. Scott entered his roommate's bedroom, retrieved his roommate's gun, and shot from the front stoop of the house. One of these shots struck and killed Victim. Police came to the house in response to a 911 call Fuller made during the incident. Scott described the SUV and indicated it had shot at the house. He did not indicate he had fired in response. Scott later turned himself in to police and was indicted for murder. He moved for immunity under section 16-11-440(C) of the South Carolina Code (2015).

At the immunity hearing, Asia testified she heard gunshots after the SUV started driving back toward the house with the lights off. Ave indicated she saw a gun hanging out the window of the SUV and saw shots fired. Denzel and Antonio testified they heard a gunshot as they were getting out of the car. Ave, Denzel, and Antonio admitted they had not mentioned hearing gunshots as they exited the car in their initial statements to police.

Fuller testified she saw the SUV drive by the house and turn around in the parking lot of the Allstate Insurance building at the end of the street. She also observed a car behind the SUV when it entered the neighborhood and testified the car made the same turn as the SUV. Fuller stated she heard a gunshot as the teens were entering the house. She called 911 while Scott retrieved the gun from his roommate's bedroom and then heard Scott say "don't do it, don't do it" and afterward another shot. Likewise, Fuller admitted she had not mentioned hearing a shot as the teens were exiting the car in her initial statement to police.

Scott testified he heard a "pow" as Fuller was getting the teens into the house. Afterward, he went into his roommate's

room and took his roommate's handgun from the nightstand, and Fuller called 911. Lenny Williams, Scott's roommate, testified Scott came into his room and grabbed his gun and then he heard some gunshots. Williams's girlfriend, who was also present, corroborated that testimony. Scott stated he ran outside the front door to the front step of the house and as the SUV drove back toward his house, he fired a warning shot and told them not to come any farther. He stated the vehicles continued to move slowly and both stopped in front of his house. He heard another shot and saw arms hanging out of the SUV's window. He then ducked behind the front hood of his vehicle parked in the front yard, fired two or three times, and returned inside the house. Scott testified he shot to defend himself and did not remember exactly where he was aiming.

In addition to Teesha, Kiwiana C. and Kyasia C. were in the SUV that night. Kiwiana admitted following the Grand Marquis and firing a gun. However, she told police she heard a shot while the SUV was parked in the Allstate parking lot and fired her gun into the air in response.[4] Teesha told police that as they drove into the neighborhood and past Scott's house, she saw a black female along with a heavy set male in the yard. She further stated she heard a gunshot while parked at the Allstate building and then heard a second shot. Teesha stated Kiwiana then fired her gun into the air once. Kyasia denied to police anyone in the SUV fired first and indicated she heard two shots before Kiwiana fired her gun into the air once. The girls admitted they thought about performing a drive-by shooting. Kiwiana even swapped places with the fourth girl[5] in the SUV for this purpose, but they changed their minds. Kyasia told police that as they left the neighborhood, they passed a burgundy Honda with its passenger door open.

Eric, the passenger in Victim's car, testified they had followed the SUV but when it went past Scott's house, Victim turned left into a cul-de-sac to turn around. Eric testified that as the Honda came back down the cul-de-sac, he could see

---

4. None of the SUV occupants testified at the immunity hearing, but they gave statements to police after the incident.

5. The identity of the fourth SUV occupant is not revealed in the record.

Scott in the yard and could tell he was light-skinned and had a gun. He indicated the SUV was directly in front of Scott's house and Scott was shooting at the SUV. He provided he did not see any shots fired from the SUV and neither he nor Victim had a gun that night.

After hearing the testimony summarized above, the circuit court determined Scott was entitled to immunity from prosecution under subsections (C) and (A) of section 16-11-440. Regarding its finding of immunity under subsection (C), the circuit court stated:

> When the Defendant fired the shot, he reasonably believed he was being attacked with deadly force directed at his home. There is absolutely no requirement that the defendant wait to be attacked by those that instigated the deadly circumstances. The Legislature intended that the defendant should not have to wait to be fired upon.
>
> . . . .
>
> I hereby conclude that the Defendant is entitled to the grant of immunity under the Act because he and his family were clearly under attack and that they had every reason to believe that the attack would have continued from both [Kiwiana] and potentially the victim but for the actions of the Defendant. The Legislature clearly did not intend for any father to stand idly by as his family lay on the kitchen floor in fear of being shot and killed.

The circuit court's order further stated Defendant "is entitled to statutory immunity under the 'Stand Your Ground' provision because [he] was reasonable to be in fear of the Victim."

This appeal followed.

## STANDARD OF REVIEW

 "A claim of immunity under the Act requires a pretrial determination using a preponderance of the evidence standard, which this court reviews under an abuse of discretion standard of review." *State v. Curry*, 406 S.C. 364, 370, 752 S.E.2d 263, 266 (2013). "A preponderance of the evidence stated simply is that evidence which convinces as to its truth." *Semken v. Semken*, 379 S.C. 71, 75, 664 S.E.2d 493, 496 (Ct. App. 2008). "An abuse of discretion occurs when the decision

of the trial court is unsupported by the evidence or controlled by an error of law." *Maybank v. BB&T Corp.*, 416 S.C. 541, 567, 787 S.E.2d 498, 511 (2016).

## LAW/ANALYSIS

██ The State contends the circuit court erred in finding Scott was entitled to immunity under section 16-11-440(C) of the South Carolina Code (2015) because the statute requires the defendant to be attacked prior to using deadly force and no evidence supports a finding Scott was attacked by Victim. Under the unique circumstances of this case, we disagree.[6]

Section 16-11-440(C) states:

A person who is not engaged in an unlawful activity and *who is attacked* in another place where he has a right to be, including, but not limited to, his place of business, *has no duty to retreat* and has the right to stand his ground and meet force with force, including deadly force, if he reasonably believes it is necessary to prevent death or great bodily injury to himself or another person or to prevent the commission of a violent crime as defined in [s]ection 16-1-60.

(emphasis added).

██ The parties agree Scott was not engaged in an unlawful activity at the time of the shooting. Additionally, he was in a place he had a right to be—inside his home and immediately outside his home. The State correctly maintains the statute's plain language excuses a defendant's obligation to retreat only if he is attacked. Scott may have reasonably believed the SUV and/or Honda was a threat so as to justify a claim of self-defense.[7] However, that is a different question

---

**6.** Because we affirm the circuit court's ruling pursuant to subsection (C), we decline to address the circuit court's finding of immunity pursuant to subsection (A). *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) ( holding the "appellate court need not address remaining issues when disposition of prior issue is dispositive").

**7.** To claim self-defense a defendant must demonstrate he (1) was without fault in bringing on the difficulty; (2) actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger; and (3) had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular

than whether he was attacked so as to excuse his duty to retreat in this case. At times, the circuit court's order conflates the two questions and is therefore erroneous to the extent it relies on Scott's perception of danger from the SUV and/or Honda *driving by* as an attack sufficient for granting immunity under subsection (C).[8]

■ However, the circuit court made numerous factual findings based on its view of the evidence and credibility determination of the witnesses—including the occupants of the SUV shot first. Although the testimony and evidence regarding the sequence of events is conflicting and muddled, this court generally defers to the credibility findings of the circuit court. *See USAA Prop. & Cas. Ins. Co. v. Clegg*, 377 S.C. 643, 652-53, 661 S.E.2d 791, 796 (2008) ("[N]oting the circuit court judge, who saw and heard the witnesses, is in a better position to evaluate their credibility and assign comparative weight to their testimony."). We conclude the circuit court's determination someone in the SUV shot first did not rise to the level of an abuse of discretion based on the applicable preponderance of the evidence standard. Therefore, the events of that night are within the purview of subsection (C) as Scott's conduct was in response to an attack, not just the vehicles driving by the home.[9]

---

instance. *State v. Curry*, 406 S.C. 364, 371 n.4, 752 S.E.2d 263, 266 n.4 (2013).

**8.** We agree with the concurrence that a defendant must establish the elements of self-defense in order to prevail on a claim for immunity. The clear language of section 16-11-440(C), however, also requires that the defendant be actually attacked. *See Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning."). While we acknowledge the facts of this case are unique, and the question of a perceived threat and an attack may sometimes overlap, absent a showing that a defendant has been attacked, a request for immunity, pursuant to subsection (C), which would excuse the duty to retreat, must fail, and a defendant must present his evidence of self-defense to a jury.

**9.** The State largely conceded at oral argument that the circuit court's factual findings were controlling and limited its argument to whether or not Scott was justified in using force specifically against Victim under

The State argues *Victim* did not attack Scott and therefore his shooting Victim could not fall within the confines of subsection (C). However, the State conceded at oral argument that if Scott shot an occupant of the SUV other than the shooter, that conduct would be justified. In essence, the State contends Scott intentionally and specifically aimed at the Honda and fired. Constrained by our standard of review, we cannot agree.

Fuller testified a second set of headlights was behind the SUV and she saw that car make the same exact turn as the SUV had made at the Allstate building. However, she had not mentioned a second car in her initial statement to police. Scott testified he saw the SUV coming down the street and headlights behind it. He observed the SUV turn around in the Allstate lot but did not see where the second car turned around. He recalled that when he came back to the stoop, both vehicles were then facing the opposite direction from which they had entered the neighborhood. He testified they were stopped in front of his house. Scott stated he shot to defend himself and did not remember directly where he was aiming or whether he shot two or three times because he was being shot at himself.

Eric, the passenger in Victim's car, testified the Honda followed the SUV onto Scott's street. However, he indicated the car never passed in front of Scott's house but turned left onto a cul-de-sac just before reaching Scott's yard and turned around. Eric testified that as the Honda exited the cul-de-sac, he saw Scott shooting at the SUV. He further testified Scott shot "at the car we [were] in," but he never saw Scott look in the direction of the car.

After hearing all the testimony and reviewing the evidence, the circuit court found:

Victim's vehicle at the scene showed that the bullet went through the driver's side window. This would be more consistent with the vehicle being directly in front of [Scott's] home traveling in the same direction as the SUV which had turned around to do the drive by.... Victim's car was found running with the lights on, just past [Scott's] house where it

subsection (C), not whether evidence supported a finding the SUV occupants shot first.

had run off the road and into brush. The passenger door was open where [Eric] fled the scene. Unfortunately, law enforcement failed to conduct any meaningful accident reconstruction of the scene that would clearly indicate where ... Victim's car was at the time that the fatal shot was fired.

. . . .

The Court finds credible [Scott's] testimony that both the Honda and SUV drove past his home and turned around and stopped in front of his residence.

Again, the evidence regarding the location of the SUV and Honda when Scott fired his weapon is conflicting and somewhat unclear. However, the circuit court found the Honda was directly in front of the house moving along the same path as the SUV. *See USAA Prop. & Cas. Ins. Co.*, 377 S.C. at 652-53, 661 S.E.2d at 796 ("[N]oting the circuit court judge, who saw and heard the witnesses, is in a better position to evaluate their credibility and assign comparative weight to their testimony."). This finding negates the State's contention the vehicles were so far apart Scott's fatal shot could have only been the result of an intentional act. We conclude the circuit court did not abuse its discretion in finding by a preponderance of the evidence Scott was entitled to immunity pursuant to subsection (C).

## CONCLUSION

The circuit court did not err in finding Scott immune from prosecution pursuant to subsection (C). We decline to address the circuit court's ruling under subsection (A). To the extent the circuit court's order equates Scott's belief the SUV or Honda posed a threat with an attack, the order is vacated. Based on our standard of review and the circuit court's factual determinations regarding the events of that tragic night, the circuit court is

**AFFIRMED AS MODIFIED.**

LOCKEMY, C.J., concurs.

MCDONALD, J., concurring in a separate opinion.

I concur in the result reached by the majority. I agree that Scott responded to an attack as opposed to a perceived threat;

however, I respectfully write separately because I do not agree that the circuit court's order conflates the questions of self-defense and immunity under the Protection of Persons and Property Act (the Act).[10] Instead, the circuit court's self-defense analysis was a necessary predicate to the finding of immunity under section 16–11–440(C) of the South Carolina Code (2015). The circuit court's examination of Scott's reasonable belief that he and the girls were being attacked with deadly force was necessary to this self-defense analysis. Thus, I would not vacate the portion of the circuit court's ruling addressing the threat posed by the "drive-by" vehicles and Scott's perception of this threat.

Recently, our supreme court clarified that the immunity of section 16–11–440(C) extends to a person attacked in his own residence and examined the Legislative purposes of the Act. In *State v. Jones*, the court explained:

Under the Castle Doctrine, "[o]ne attacked, without fault on his part, on his own premises, has the right, in establishing his plea of self-defense, to claim immunity from the law of retreat, which ordinarily is an essential element of that defense." *State v. Gordon*, 128 S.C. 422, 425, 122 S.E. 501, 502 (1924)) (citation omitted). The Legislature explicitly codified the Castle Doctrine when it promulgated the Act and extended its protection, when applicable, to include an occupied vehicle and a person's place of business. *See* S.C. Code Ann. § 16–11–420(A) (2015) ("It is the intent of the General Assembly to codify the common law Castle Doctrine which recognizes that a person's home is his castle and to extend the doctrine to include an occupied vehicle and the person's place of business.").

416 S.C. 283, 291, 786 S.E.2d 132, 136 (2016) (alteration in original). The court enunciated its belief that "a decision that prohibits a person, who is attacked in his or her residence, from seeking immunity under the Act would not only be in direct contravention of the provisions of the Act but would undoubtedly infringe on the person's Second Amendment

---

**10.** S.C. Code Ann. §§ 16–11–410 to –450 (2015); *see id.* § 16–11–450(A) (stating, in relevant part, "[a] person who uses deadly force as permitted by the provisions of this article or another applicable provision of law is justified in using deadly force and is immune from criminal prosecution and civil action for the use of deadly force").

right to bear arms,[11] which was specifically identified in section 16–11–420(C) as a foundational basis for the Act." *Id.* at 297–98, 786 S.E.2d at 140; *see District of Columbia v. Heller*, 554 U.S. 570, 628, 128 S.Ct. 2783, 171 L.Ed.2d 637, (2008) ("[T]he inherent right of self-defense has been central to the Second Amendment right.").

Because the supreme court found subsection (C) applicable in *Jones*, the question became whether there was "evidence to support the judge's ruling that Jones acted in self-defense." *Id.* at 300–01, 786 S.E.2d at 141. "Consistent with the Castle Doctrine and the text of the Act, a valid case of self-defense must exist, and the trial court must necessarily consider the elements of self-defense in determining a defendant's entitlement to the Act's immunity. Therefore, the defendant must demonstrate the elements of self-defense, save the duty to retreat, by a preponderance of the evidence." *Id.* at 301, 786 S.E.2d at 141 (quoting *State v. Curry*, 406 S.C. 364, 371, 752 S.E.2d 263, 266 (2013));[12] *see also State v. Douglas*, 411 S.C. 307, 318, 768 S.E.2d 232, 238 (Ct. App. 2014) (recognizing that "immunity under the Act 'is predicated on an accused demonstrating the elements of self-defense to the satisfaction of the trial court by the preponderance of the evidence,' save the duty to retreat." (quoting *Curry*, 406 S.C. at 371–72, 752 S.E.2d at 266–67)); *Curry*, 406 S.C. at 372, 752 S.E.2d at 267 ("While the Act may be considered 'offensive' in the sense that the immunity operates as a bar to prosecution, such immunity is predicated on an accused demonstrating the elements of self-defense to the satisfaction of the trial court by the preponderance of the evidence.").

11. U.S. Const. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."); S.C. Const. art. I, § 20 (providing in part that "[a] well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed").

12. Where section 16–11–440(A) applies, "there is no requirement that the defendant prove he believed he was in imminent danger of losing his life or sustaining serious bodily injury given the presumption of reasonable fear of imminent peril of death or great bodily injury is included in subsection (A)." *Jones*, 416 S.C. at 301, 786 S.E.2d at 141. Here, as in *Jones*, the consideration is whether subsection (C) applies.

120

As the circuit court's examination of Scott's reasonable belief that he and the girls were being attacked with deadly force was necessary to its self-defense analysis, a predicate to the court's finding of immunity, I would affirm both the subsection (C) grant of immunity and the circuit court's analysis.