JUSTICE FEW :
**466 The circuit court granted Shannon Scott immunity pursuant to the Protection of Persons and Property Act, and the court of appeals affirmed. We affirm the court of appeals as modified.
I. Facts and Procedural History
On the night of April 10, 2010, Shannon Scott and his fiancé Rosalyn were asleep at Scott's home. Scott's daughter Shade and three of Rosalyn's daughters were at a party at a teen nightclub with friends. Shade had a history of problems with a girl named Teesha and her friends. Shade testified Teesha "started with me" by "flipping my hair, like back flipping my hair trying to hit me." Shade and her friends left the party but Teesha followed them into the parking lot where Shade described her as, "Being like ready to fight." Shade and her group left in one vehicle and Teesha and her group followed in an SUV. A third vehicle, a Honda, driven by the deceased-Darrell Niles-followed behind Teesha. It is unclear why Niles was following the two vehicles.
As Shade's group was driving away from the club, they stopped at a red traffic light. Shade and two other passengers in the vehicle testified that when Teesha's group stopped at the light, someone got out of Teesha's vehicle and approached their vehicle with a gun. Shade's group ran the red light and **467 Teesha's group pursued them. Shade's group attempted to pull into a police station but the station was closed. One of the girls called her mother Rosalyn and explained they were being chased by Teesha. Rosalyn woke up Scott and informed him their daughters were being chased by "those girls." Rosalyn instructed her daughter to drive to Scott's home. It is unclear whether Scott or Rosalyn were informed of the presence of the gun.
When Shade's group arrived, they pulled around to the back of the house. Scott testified, "While they're going into the backyard, I see the truck coming down and some more headlights behind it." Scott and Rosalyn helped the girls inside through the back door. Two of Rosalyn's daughters testified they heard a gunshot as they were entering the house. Scott and Rosalyn also testified they heard a gunshot while they were getting the children inside. Rosalyn specifically testified Scott was in the house when she heard the first gunshot. After the gunshot, Rosalyn called 911.
After Scott heard the gunshot, he retrieved his roommate's gun and "ran" toward his front door. Both vehicles had driven past Scott's house and turned around, and both were positioned so the driver's side of the vehicle was facing the front of Scott's house. Scott testified,
The SUV ... turned around .... There was another car behind it. I seen the headlights.
*118 The SUV came back up. As it came back up, it cut the headlights off and it was proceeding to come my way, maybe three miles per hour.
The circuit court found Scott did not fire first. "The credible testimony established that they turned the SUV around, turned off the lights, rolled down the windows and drove by [Scott's] home and began to fire." The court found that "in response to these events, [Scott] exited the front of his home onto a very small stoop." As the two vehicles approached, Scott fired a warning shot "straight in the air" and yelled not to come any closer. Scott testified,
After I fired the warning shot, the car proceeded to come closer and I heard another shot. I ducked down over the front hood of my vehicle that was parked up front all the way to the porch. And as I was ducking down and going **468 back into the house at the same time, I shot back again. I shot and went back into the house.
He remembered he shot "twice, possibly three" times. The police arrived a few minutes later and discovered Niles was dead from a gunshot.
The State indicted Scott for murder. The circuit court granted Scott's motion for immunity under the Act. The court of appeals affirmed. State v. Scott , 420 S.C. 108, 800 S.E.2d 793 (Ct. App. 2017). The State and Scott filed petitions for a writ of certiorari, and we granted both petitions.
II. Analysis
In State v. Curry , 406 S.C. 364, 752 S.E.2d 263 (2013), we stated, "Section 16-11-450 provides immunity from prosecution if a person is found to be justified in using deadly force under the Act." 406 S.C. at 371, 752 S.E.2d at 266. Subsection 16-11-450(A) of the South Carolina Code (2015) provides,
A person who uses deadly force as permitted by the provisions of this article or another applicable provision of law is justified in using deadly force and is immune from criminal prosecution and civil action for the use of deadly force, unless the person against whom deadly force was used is a law enforcement officer acting in the performance of his official duties ....
Scott argues his right to self-defense and to defend his family are both a "provision of law" that permitted him to use deadly force. According to Scott, "the legislature must have anticipated a circumstance such as the one in this case, where a person's children were in imminent peril, and shots were being fired at him, his house, or towards his house, and where that person would be entitled to defend himself and his family."
We focus our analysis on self-defense. As we stated in Curry , "Consistent with the Castle Doctrine and the text of the Act, a valid case of self-defense must exist, and the trial court must necessarily consider the elements of self-defense in determining a defendant's entitlement to the Act's immunity." 406 S.C. at 371, 752 S.E.2d at 266.
There are four elements that must be established to justify the use of deadly force as self-defense.
**469 State v. Dickey , 394 S.C. 491, 499, 716 S.E.2d 97, 101 (2011). Scott bears the burden of proving these elements by the preponderance of the evidence. State v. Duncan , 392 S.C. 404, 411, 709 S.E.2d 662, 665 (2011). The elements are,
(1) The defendant was without fault in bringing on the difficulty; (2) The defendant ... actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger; (3) If the defense is based upon the defendant's actual belief of imminent danger, a reasonable prudent man of ordinary firmness and courage would have entertained the same belief ...; and (4) The defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance.
Dickey , 394 S.C. at 499, 716 S.E.2d at 101 (quoting State v. Wiggins , 330 S.C. 538, 545, 500 S.E.2d 489, 493 (1998) ).
The circuit court's order did not follow this structure with precision, but we can glean from its order the necessary findings of fact to support the conclusion that Scott established the four elements of self-defense.
*119 First, as to the requirement that the defendant was without fault in bringing on the difficulty, the State did not argue Scott was at fault, nor is there any evidence in the record Scott was at fault. Scott was asleep in his home when Rosalyn woke him up and told him their daughters were being chased by Teesha. Scott was ushering his daughter and her friends into his house when he heard a gunshot. The circuit court found the girls in Teesha's vehicle "instigated the deadly circumstances." The court of appeals stated, "The parties agree Scott was not engaged in an unlawful activity at the time of the shooting." 420 S.C. at 114, 800 S.E.2d at 796.
Second, as to the requirement that the defendant believed he was in imminent danger of losing his life or sustaining serious injury, the circuit court found Scott had "a reasonable fear of imminent peril of death" and "it is abundantly clear to the Court ... the environment inside [Scott's] home was one of terrified, panicked young people, but also terribly frightened adults." There is evidence to support these findings.
**470 Third, as to the requirement that the defendant's belief was reasonable, the circuit court found, "When [Scott] fired the shot, he reasonably believed he was being attacked with deadly force directed at his home." This finding is supported by the same evidence that supports Scott's actual belief. As to this element, however, the State and the dissent differentiate between the reasonableness of Scott's fear of attack by the occupants of Teesha's vehicle and his fear of attack by Niles. We will address this point separately below.
Finally, as to the requirement that the defendant had no other probable means of avoiding the danger, the circuit court found, "shots were fired by [one of the girls in Teesha's group] and then by [Scott] as [Scott] stood on the curtilage of his home." Based on this finding, the circuit court correctly concluded Scott was excused from proving this element because he was within the curtilage of his own home when he fired the shots. The circuit court stated, "At no point is it required that [Scott] retreat into his home to be fired upon without him being able to defend ... himself." See State v. Jones , 416 S.C. 283, 291, 786 S.E.2d 132, 136 (2016) ("Under the Castle Doctrine, '[o]ne attacked, without fault on his part, on his own premises, has the right, in establishing his plea of self-defense, to claim immunity from the law of retreat, which ordinarily is an essential element of that defense.' " (quoting State v. Gordon , 128 S.C. 422, 425, 122 S.E. 501, 502 (1924) ) ); State v. Grantham , 224 S.C. 41, 45, 77 S.E.2d 291, 293 (1953) (holding that a person "in his home lawfully occupied by him and ... without fault in bringing on the difficulty was not bound to retreat in order to invoke the benefit of the doctrine of self-defense, but could stand his ground and repel the attack with as much force as was reasonably necessary"); see also Wiggins , 330 S.C. at 548 n.15, 500 S.E.2d at 494 n.15 ("We have followed the general rule that the absence of a duty to retreat also extends to the curtilage of a home."); 40 Am. Jur. 2d Homicide § 165 (2008) ("[T]here is general agreement that no duty to retreat rests upon one who, without fault, is attacked by another when in his or her own curtilage."); Curry , 406 S.C. at 371 n.4, 752 S.E.2d at 266 n.4. ("It is the fourth element-the duty to retreat-that is excused under the Act and the Castle Doctrine."). The circuit court correctly found Scott satisfied the fourth element.
**471 Therefore, the circuit court made the necessary factual findings to support the existence of self-defense. Because those findings are supported by the evidence, our standard of review requires that we uphold them. See State v. Manning , 418 S.C. 38, 45, 791 S.E.2d 148, 151 (2016) (explaining we review immunity determinations for an abuse of discretion, which "occurs when the trial court's ruling ... is without evidentiary support." (quoting State v. Douglas , 411 S.C. 307, 316, 768 S.E.2d 232, 237 (Ct. App. 2014) ) ).
The State argues, however, that even if Scott was entitled to use deadly force against the occupants of Teesha's vehicle under the law of self-defense, he was not entitled to use deadly force against Niles. As support for this argument, the State points out the two vehicles were some distance apart, so Scott had to shoot in a different direction to hit Niles. The State poses this alleged error as *120 an error of law, arguing Scott had no legal right to shoot an "innocent bystander." We frame the issue as one of fact. We believe the appropriate question is whether Scott was justified in using deadly force against the occupants of Niles' vehicle, which in turn depends on whether he established the elements of self-defense as to those occupants.
As we discussed, the first and fourth elements are not in dispute. So, we focus our analysis of the State's argument as to elements two and three. Obviously, if Scott reasonably feared an occupant of Teesha's vehicle was going to shoot him, that fear would not justify Scott to shoot in a different direction at an innocent bystander. However, if Scott reasonably believed he was being attacked by gunfire by occupants of both vehicles, then he would be entitled to use deadly force against both vehicles.
The circuit court addressed the State's "innocent bystander" argument directly. First, the court made general findings regarding the existence and reasonableness of Scott's fear of attack by gunfire,
The court finds credible [Scott's] testimony that both the Honda and SUV drove past his home and turned around and stopped in front of his residence. ... His testimony was very credible that he heard a gunshot. Hearing a gunshot, along with the threats, the chase, and being confronted at **472 his home as the target of a drive by shooting, with his children inside, created a reasonable fear of imminent peril of death for him and his family.
Then, the court related that reasonable fear directly to Niles,
[Niles] had followed [Scott's] daughters home while they were being chased by another vehicle. [Niles] never identified himself to [Scott] and in doing so left [Scott] to reasonably believe that [Niles] too was an imminent threat. If in fact [Niles] was present merely to observe these events or even assist those being chased in some way, the credible evidence presented simply fails to support such a finding.
The court also found Scott "reasonably believed [Niles] was engaged in an unlawful and forcible act against his home."
The dissent disagrees the evidence supports the circuit court's findings regarding Niles. Respectfully, however, the dissent confuses what we know from reading the record of the immunity hearing with what Scott knew in the heat of the moment on his porch that night. The dissent states, "Scott may have been apprised about the danger posed to his family by Teesha Davis and the passengers in her vehicle, not by Darrell Niles," and "a close examination of the record demonstrates the threats, the chase, and the drive-by shooting all are attributed to the SUV." From our hindsight review of the record, we know Teesha's vehicle was the SUV, but there is no evidence Scott knew that. Scott knew only that his daughter had been chased home, and when they arrived he saw two vehicles behind her. While he was securing his daughter in the house he heard a gunshot. He then armed himself, exited the front of his house, and saw two vehicles driving in the opposite direction "maybe three miles per hour."
At oral argument, Justice James asked the State, "Does [Scott] have to interview, I'm not being facetious, does he have to interview the perpetrators and ask 'which one of you fired that shot so I can fire my shot accordingly?' " The answer is, "No," because, "A person has the right to act on appearances, even if the person's belief is ultimately mistaken." Dickey , 394 S.C. at 501, 716 S.E.2d at 102 (citing State v. Fuller , 297 S.C. 440, 443-44, 377 S.E.2d 328, 331 (1989) ). The circuit court understood this, and found based on the evidence of what Scott knew and observed in the heat of that moment, **473 "[Scott] reasonably believed [Niles] was engaged in an unlawful and forcible act against his home."
Subsection 16-11-450(A) provides that "[a] person who uses deadly force as permitted by ... an[ ] applicable provision of law is justified in using deadly force and is immune from criminal prosecution." Self-defense is the classic provision of law that justifies the use of deadly force. It was clearly the Legislature's intent that if a person seeking immunity under subsection 16-11-450(A) could prove the elements of self-defense in an immunity *121 proceeding, immunity must be granted. In Curry , we stated "a valid case of self-defense must exist," and found that the circuit court's finding in that case that the defendant had not proven self-defense was supported by the evidence. 406 S.C. at 371, 752 S.E.2d at 266. Explaining our ruling to affirm the denial of immunity, we stated, "Appellant's claim of self-defense presents a quintessential jury question." 406 S.C. at 372, 752 S.E.2d at 267. In this case, we have the opposite situation. The circuit court's finding that Scott did prove self-defense is supported by the evidence. In this case, therefore, we must affirm the circuit court's order granting immunity.
III. Section 16-11-440
The State, Scott, the court of appeals, and the circuit court spent considerable time addressing the applicability of subsections (A) and (C) of section 16-11-440 of the South Carolina Code (2015). We address those subsections in turn.
A. Subsection 16-11-440(A)
Subsection 16-11-440(A) provides in relation to this case,
A person is presumed to have a reasonable fear of imminent peril of death or great bodily injury ... if the person: (1) against whom the deadly force is used is in the process of unlawfully and forcefully entering ... a dwelling[ or] residence ...; and (2) [the person] who uses deadly force knows or has reason to believe that an unlawful and forcible entry or unlawful and forcible act is occurring or has occurred.
The circuit court found the subsection 16-11-440(A) presumption of reasonable fear applies to Scott. However, there is no **474 evidence whatsoever in this record that Niles or anyone else was "in the process of unlawfully and forcefully entering a dwelling or residence," a prerequisite that clearly must be met before the presumption applies. Therefore, the circuit court erred in finding that subsection 16-11-440(A) applied.
In this case, however, Scott did not need a presumption of reasonable fear because he proved to the circuit court's satisfaction as a matter of fact that his fear was reasonable. As we have already discussed, the circuit court found Scott "reasonably believe[d] that [Niles] was an imminent threat," and Scott "reasonably believed [Niles] was engaged in an unlawful and forcible act against his home." These findings-which are supported by the evidence-made it unnecessary for the circuit court to address whether the reasonableness of Scott's fear should be presumed pursuant to subsection 16-11-440(A).
B. Subsection 16-11-440(C)
Subsection 16-11-440(C) provides,
A person who is not engaged in an unlawful activity and who is attacked in another place where he has a right to be, including, but not limited to, his place of business, has no duty to retreat and has the right to stand his ground and meet force with force, including deadly force, if he reasonably believes it is necessary to prevent death or great bodily injury to himself or another person ....
The circuit court found subsection 16-11-440(C) applied to Scott, and the court of appeals agreed. Scott , 420 S.C. at 114, 800 S.E.2d at 796. We agree. Scott (1) was "not engaged in an unlawful activity," (2) was "attacked," (3) was "in another place where he ha[d] a right to be," and (4) "reasonably believe[d] [the use of deadly force] [wa]s necessary to prevent death or great bodily injury to himself or another person." Therefore, subsection 16-11-440(C) clearly provides he "ha[d] no duty to retreat and ha[d] the right to stand his ground and meet force with force."
However, the applicability of subsection 16-11-440(C) was not essential to the circuit court's finding of immunity in this case. Because Scott was in the curtilage of his home when he used deadly force against Niles, he already had no duty to retreat, and was free to stand his ground and meet force with **475 force, pursuant to the Castle Doctrine as we explained in Grantham , 224 S.C. at 45, 77 S.E.2d at 293. The purpose of subsection 16-11-440(C) was merely to extend this common law right to "[ ]other place[s] where he has a right to be." S.C. Code Ann. § 16-11-440(C) ; see S.C. Code Ann. § 16-11-420(A) (2015) ("It is the intent of the General Assembly to codify the common law Castle Doctrine which *122 recognizes that a person's home is his castle and to extend the doctrine to include an occupied vehicle and the person's place of business."); Jones , 416 S.C. at 291, 786 S.E.2d at 136 (noting subsection 16-11-420(A) "extended [the Castle Doctrine's] protection, when applicable, to include an occupied vehicle and a person's place of business"). In this case, that extension is unnecessary.
IV. Conclusion
There is evidence in the record to support Scott's use of deadly force against Niles under the doctrine of self-defense. Therefore, he was entitled to immunity pursuant to Subsection 16-11-450(A) of the Protection of Persons and Property Act. We AFFIRM AS MODIFIED .
BEATTY, C.J., and JAMES, J., concur. KITTREDGE, J., concurring in a separate opinion. HEARN, J., dissenting in a separate opinion.
I concur with Justice Few's majority opinion. While I am of the view that our deferential standard of review constrains us to uphold the trial court's grant of immunity to Shannon Scott, I write separately because I believe Justice Hearn's dissent raises significant and legitimate concerns regarding the reach of the Protection of Persons and Property Act. I, too, question whether the General Assembly intended to empower the judicial branch with authority to grant immunity in this circumstance. The Act, which purports to codify the Castle Doctrine and assign the power to grant immunity from the executive branch to the judicial branch, is far from a model of clarity. As a result, this Court has wrestled in a number of cases to discern legislative intent in particular situations. I believe today's majority opinion is a faithful effort to honor legislative intent in terms of the substantive application of the Act, as **476 well as the judicially engrafted procedures this Court has been required to establish. See State v. Curry , 406 S.C. 364, 370 n.3, 752 S.E.2d 263, 266 n.3 (2013) (noting that "the Act is silent on the procedure to follow when an accused seeks immunity"). Over time, without legislative action, this Court will continue to do its best to fill in the many unanswered gaps of the Act. Ideally, the General Assembly will respond at some point and provide clarity in terms of the reach and applicability of the Act. With clearer legislative guidance, this Court could more assuredly honor its proper and limited role of interpreting the law. Perhaps the result in this case, for the reasons advanced by Justice Hearn, will prompt legislative action. Pending clarification of the Act, given our current abuse of discretion standard of review, I join the majority opinion because there is some evidence to uphold the trial court.
As I disagree with the majority's view that there is evidence in the record to support Scott's use of deadly force against Niles, I respectfully dissent.
I acknowledge this Court's limited lens when reviewing a circuit court's factual findings from an immunity hearing under the Protection of Persons and Property Act (the Act). Most certainly, it is within the circuit court's province to determine the credibility of the witnesses. Nevertheless, while numerous factual inconsistencies permeate this record, all relate to the extent Scott may have been apprised about the danger posed to his family by Teesha Davis and the passengers in her vehicle, not by Darrell Niles, the apparent bystander who was killed by Scott's gunfire.
While there was a factual issue concerning whether Scott knew someone in Teesha Davis's vehicle (the SUV) had a gun, the record is devoid of any evidence demonstrating Niles or Eric Washington, the two occupants in the third vehicle (the Honda), presented any threat. The evidence presented at the hearing all concerned Scott's belief that Teesha and her accomplices followed Shade's vehicle. Numerous witnesses in Shade's car, including Asia Mills, Ave Fuller, Denzel Davis, and Antonio Bennet, testified that Teesha or someone else in the SUV had a gun. Many of these witnesses also testified to **477 hearing gunfire upon pulling into Scott's driveway, and Scott testified he only armed himself with his roommate's gun after hearing *123 a gunshot. In their statements to police, none of these witnesses mentioned the existence of a gun or hearing gunshots while in the driveway; however, it was up to the circuit court to determine what and whom to believe. Indeed, Sergeant Thomas testified that at no time during the investigation did any of the witnesses mention that Teesha displayed a gun; the first time he learned of this fact was during the immunity hearing. Regardless, the testimony of Scott's daughter-that she told her father they were being followed by a car with a gun in it-and of Scott and the other witnesses-that they heard gunfire shortly after the daughter pulled into Scott's driveway-unquestionably provided a sufficient basis for the circuit court to conclude that the occupants in the SUV placed Scott in "reasonable fear of imminent peril of death" for him and his family. While this finding justifies the use of deadly force as to those in the SUV , it does not relieve Scott's burden of proving Niles posed a similar threat.
Accordingly, in order for Scott to successfully gain immunity under the Act, it was incumbent upon him to present evidence that Niles presented an imminent threat to the safety of Scott and his family. There is absolutely no evidence in the record to support the circuit court's conclusory finding that Scott reasonably believed Niles "was engaged in an unlawful and forcible act against his home." Moreover, unlike the majority, I believe the circuit court's general findings regarding the reasonableness of Scott's fear are irrelevant as to Niles . The majority relies in part on the following finding by the circuit court: "Hearing a gunshot, along with the threats, the chase, and being confronted at his home as the target of a drive by shooting, with his children inside, created a reasonable fear of imminent peril for him and his family." However, a close examination of the record demonstrates the threats, the chase, and the drive-by shooting all are attributed to the SUV. Teesha Davis and Shade's prior history, the hair flipping at the club, and the frantic call to Scott or Rosalyn[1] do not demonstrate that Niles posed a threat. Further, while Niles followed the SUV, the "chase" cannot reasonably be viewed as **478 involving Niles because Scott was not even aware of a third vehicle until after his daughter's group arrived home. Scott testified his daughter's car and the SUV were driving "like a race...just two cars top speed, bumper to bumper almost," without mentioning a third vehicle. Finally, the record contains no evidence Niles was involved in the drive-by shooting. Washington testified the Honda had its lights on and windows up-the same condition as when police found it. In contrast, the SUV had its headlights off, drove at a creeping pace in front of Scott's house, and had an occupant hanging her arms out the window.
Even viewing the facts in the light most favorable to Scott, at most, Niles' vehicle was simply following behind the SUV on a public roadway. His vehicle was not the source of any gunfire or other threats. No witnesses testified to any fear from Niles or Washington. Indeed, most of the witnesses never even saw that vehicle, including Shade, her stepsister Ave Fuller, and Denzel Davis. Likewise, a fourth occupant, Antonio Bennet, did not testify that he saw a second car following them. Only Asia Mills, Rosalyn, and Scott testified seeing Niles' vehicle that night and they said nothing that would indicate they felt the Honda was a threat. For example, Mills stated: "the only time I saw the second car was when they turned around at the Allstate and that was it." Rosalyn also testified to seeing the Honda turn around at Allstate, and Scott noted he saw the SUV stop in front of his house, followed by the Honda.
Additionally, Sergeant Reese, one of the two investigating officers, testified that none of the witnesses reported a third vehicle being involved in this incident. In fact, when police arrived at Scott's house, they left to search only for the SUV and were unaware that a third car was involved until after returning to the house and discovering it in a ditch, where they found Niles deceased from a gunshot to the head. The other investigator, Sergeant Thomas, stated unequivocally that throughout the investigation, no witness *124 reported anyone other than the occupants in the SUV posed a threat to Shade's group.
Nevertheless, Scott fired not in the direction of the SUV, but toward an unarmed, innocent bystander whose only act of **479 aggression was to drive by Scott's house on a public road. I do not believe our General Assembly intended to grant absolute immunity to an individual like Scott under such circumstances. Accordingly, I dissent and would reverse and remand for a trial, where Scott's claim of self-defense would be determined by a jury.

Witness testimony differed as to who was called.