# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

John W. McCarty, Petitioner.

Appellate Case No. 2021-000062

―――――――――

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

―――――――――

Appeal From Pickens County
Letitia H. Verdin, Circuit Court Judge

―――――――――

Opinion No. 28116
Heard June 8, 2022 – Filed September 21, 2022

―――――――――

## REVERSED AND REMANDED

―――――――――

Appellate Defender Susan Barber Hackett, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, Assistant Attorney General Michael G. Ross, and Assistant Attorney General Julianna E. Battenfield, all of Columbia; and Solicitor William Walter Wilkins III, of Greenville, for Respondent.

―――――――――

**CHIEF JUSTICE BEATTY:**   John W. McCarty ("Petitioner") was charged with murder and possession of a weapon during the commission of a violent crime. Petitioner maintained he acted in defense of another and filed a motion seeking immunity from criminal prosecution pursuant to the South Carolina Protection of Persons and Property Act ("Act").[1]  After a pretrial hearing, the circuit court denied the motion, and Petitioner was subsequently tried and convicted as charged.  On appeal, Petitioner challenged the circuit court's ruling as to immunity, and the court of appeals affirmed in *State v. McCarty*, 2020-UP-269 (S.C. Ct. App. filed Sept. 23, 2020).   This Court has granted a petition for a writ of certiorari to consider Petitioner's arguments that (1) the court of appeals erred in failing to hold the circuit court abdicated its role as the fact-finder by ruling a jury, not the court, must decide whether the individual Petitioner was defending was without fault in bringing on the difficulty; and (2) this Court should conclude Petitioner is entitled to immunity.  We agree with Petitioner as to the first issue, but hold the issue of immunity should be decided in the first instance by the circuit court.  As a result, we reverse the decision of the court of appeals and remand the matter to the circuit court to make the necessary findings.

## I.  FACTS

The charges against Petitioner arose from the July 15, 2015 shooting death of Mitchell Bradley.  Petitioner moved for immunity under the Act on the basis he acted in defense of Randy Wilson, his partner of nearly thirty years.  The circuit court held a pretrial hearing on the motion on February 23, 2017, at which Petitioner, Wilson, Jacob Kirk, and two deputies from the Pickens County Sheriff's Office testified.  As the circuit court ultimately noted in its ruling on the motion, many of the core facts were not in dispute.

Petitioner and Wilson shared a mobile home owned by Wilson in Liberty, South Carolina.  Less than two years before the 2015 altercation, they allowed Bradley's brother, Jacob Kirk, to begin living with them rent-free in exchange for Kirk helping Wilson with household chores and errands.  Wilson had recently stopped working due to increasing pain and physical impairment from injuries suffered as a teenager in 1980, including a broken neck, and Petitioner still worked full-time, so Wilson wanted assistance with activities around the home.  Wilson

---

[1] *See* S.C. Code Ann. §§ 16-11-410 to -450 (2015).

knew Kirk and his family because he had worked for Kirk's grandfather until his physical condition deteriorated.

On the evening of July 15, 2015, Bradley, who was in his twenties, was at the home visiting his brother. Petitioner testified Kirk appeared to come home from work in a bad mood, and Kirk acknowledged that he began drinking as soon as he got home from work, sometime between 5:00 p.m. and 5:30 p.m. Later in the evening, Bradley and Kirk were drinking together on the porch, and Kirk came inside to get something to eat. By that time, Wilson and Petitioner had already eaten and Petitioner had gone to bed, so Wilson placed several plates of leftovers for Bradley and Kirk in the microwave. Wilson was on the phone talking to his niece when Kirk came in.

An argument began between Kirk and Wilson when Kirk interrupted Wilson several times to ask about the leftovers while Wilson was on the phone. Kirk, who was admittedly intoxicated (Kirk conceded that he and his brother, Bradley, had consumed "at least" ten or more beers each and were "drunk"), began talking loudly to Wilson, asking him questions about how to "divvy up" the plates of food.

According to Wilson, he told Kirk, "[C]an't you see I'm on the phone[?]" Kirk then got angry and hit or bumped Wilson on the shoulder. Kirk began yelling at Wilson and allegedly stated during their argument that he "was going to slice [Wilson] up." Kirk began packing his belongings, but Bradley also "started getting mouthy," so Wilson told Bradley that he needed to leave the home, as he did not live there, and Bradley refused. Wilson called 9-1-1 for assistance. While waiting on law enforcement, Wilson went outside to repair Kirk's truck so Kirk would have a way to carry all of his belongings.[2]

Kirk's recollection also was that his statements to Wilson over the food are "what sparked everything." Kirk acknowledged that he "was furious" with Wilson and that he could be heard screaming in the background during the recording of Wilson's 9-1-1 call. Kirk testified he was screaming at Wilson because he "was

---

[2] Kirk testified that, although his truck was not running, his brother had a car they could have used, but one of the reasons they did not leave immediately was because they were both too drunk to drive. Kirk also testified that, in hindsight, he and his brother should have left the premises, adding, "The whole argument started over nothing."

trying to do more of an intimidating type of thing showing him [Wilson] that I'm not afraid of him . . . ."

One of the deputies who responded to the 9-1-1 call testified that he noticed all three men involved in the dispute, Wilson, Kirk, and Bradley, appeared to be grossly intoxicated. Petitioner, however, was asleep in his bedroom. The deputy concluded the men had been involved in an argument over food and that Wilson wanted Bradley to leave, but Kirk wanted him to stay. The deputy informed Wilson that, because Kirk was a resident, he did not believe he could make his invited guest (Bradley) leave.[3] Although the deputy testified everyone appeared to be "chill" during their conversation, he recalled that as he left, he heard Wilson shout out to him that he was going to have to come back to the home.

The evidence at the hearing indicates the argument resumed within minutes after the deputies left and turned into a physical altercation between Wilson and Bradley. Kirk acknowledged that after the officers left, he went over to Wilson while Wilson was working on his (Kirk's) truck and told him, "[S]ee, just because it's your property doesn't mean that you get to control everything that goes on here." Kirk testified that this upset Wilson, who then threw down the tool that he was using and began "shuffling" through Bradley's cigarettes and cigarette tubes. According to Kirk, Bradley became upset and grabbed Wilson and told Wilson to "stop f'ing with my S, Randy," and Wilson allegedly grabbed Bradley at the same time. However, Bradley then shoved Wilson down the outside stairs leading to the porch and the back door of the home. The force broke several of the steps and Wilson's foot.

Kirk testified he noticed Wilson held onto the hand railing and appeared to struggle to go back up the stairs to the home after he was pushed down, but at that time he did not realize Wilson had sustained any broken bones and thought his gout was hurting him. Kirk contended Wilson "smacked" a beer off of the hand railing as he made his way up the steps and that this angered Bradley, who began "popping [Wilson] in the face" with his hand as Wilson screamed for help from Petitioner. Kirk stated he did not believe Bradley struck Wilson with "serious force," and opined that his brother "was slapping [Wilson], trying to . . . incite him to throw the first

---

[3] Although we need not address this point for our decision today, we note that, while Kirk resided at the home, the home was owned by Wilson. *Cf. State v. Douglas*, 411 S.C. 307, 322, 768 S.E.2d 232, 240–41 (Ct. App. 2014) ("A man who attempts to force himself into another's dwelling, or who, *being in the dwelling by invitation or license refuses to leave when the owner makes that demand, is a trespasser . . . .*" (quoting *State v. Bradley,* 126 S.C. 528, 533, 120 S.E. 240, 242 (1923))).

punch." Kirk recalled Bradley "kept on popping" Wilson and said to Wilson, "What you hollering for [Petitioner] for?" At that point, he saw Petitioner come to the door, and he (Kirk) yelled to his brother that Petitioner had a gun. Kirk stated Petitioner fired a shot at the floor once and pushed on the door but did not come outside. Petitioner then shot at Bradley twice, striking him.

Wilson testified he was working on Kirk's truck after the officers left and at one point he accidentally knocked over Bradley's beer that was sitting near the engine.[4] Wilson stated Bradley grabbed him by the arm but then went and got another beer, so he thought the interaction was over. When Wilson finished working on the truck, he proceeded to go up the steps to the home's porch, but Bradley shoved him down the stairs, breaking two of the steps and bones in his foot. Wilson testified he tried to get back up the stairs by gripping the hand railing and, in doing so, he knocked over a beer left sitting on the hand railing. Wilson stated he was trying to get back inside the home, but Bradley pushed him down and he could not get inside the home, so he started screaming for help from Petitioner. Wilson testified Kirk did not try to stop the altercation and instead was inciting his brother with his comments, which intensified Bradley's anger. Wilson acknowledged that he had some liquor that evening, but he stated he was not drinking heavily like the two younger men.

Wilson testified that he was concerned for his life and safety as his neck was fragile due to both his prior surgery for a broken neck and his osteoporosis condition, and his neck was being twisted roughly by Bradley during the altercation. Wilson recalled Petitioner ran to the kitchen and fired a warning shot at the floor, but Bradley did not stop, so Petitioner fired again, striking Bradley. Wilson then administered CPR to Bradley. Wilson stated he believed Petitioner prevented him from sustaining serious bodily injury or death. Wilson's testimony was supplemented with photographs taken at the scene showing him with blood running down both of his legs and one leg that was badly swollen from the break he sustained from being pushed down the stairs.

As outlined above, Kirk's testimony substantially tracked Wilson's, but he indicated Wilson intentionally tossed around Bradley's beers and cigarettes. Kirk stated he did not view Wilson as fragile and would have stepped in if he thought the fight was getting serious. Kirk stated he thought Wilson and Bradley "needed to fight" and that Bradley did not get physical until Wilson allegedly "started messing with his [Bradley's] belongings," which he described as his "cigarettes, tobacco,

---

[4] Kirk testified the interaction at the truck either did not happen or he missed it.

beer." Kirk stated: "I know those all aren't things to get upset about. But to some people, it's an attack to their character." When he was asked if he wanted to see Wilson to get hurt that evening, Kirk stated: "Not like serious injury. I wanted to see him fight it out." At another point when he was asked why he did not try to break up the fight between his brother and Wilson, Kirk admitted, "I was okay with it happening." Importantly, Kirk ultimately agreed that Wilson "was trying to get away, trying to get back in the house and [Bradley] wasn't letting him do that."

Petitioner testified that he was in bed when the first 9-1-1 call occurred that evening, and an officer came to his room and stated the situation was under control and there was no reason to get up. Petitioner stated he later woke up upon hearing Wilson screaming his name and pleading for help in an unusually high-pitched, piercing tone of voice that he had never heard before, so he "knew there was something seriously wrong." Petitioner stated he grabbed his handgun and went towards the door and saw Bradley holding Wilson, so he fired a warning shot towards the floor, but Bradley did not stop "swinging" at Wilson. Petitioner tried to kick open the door, but the door was blocked by Bradley and Wilson on the other side, so he shot through the window, striking Bradley. Petitioner stated his intent was only to wound Bradley, not kill him. Petitioner stated he believed he had no choice but to act immediately to defend Wilson to prevent him from being seriously hurt or killed by Bradley.

A deputy with the forensics unit of the Pickens County Sheriff's Office confirmed Bradley died from two gunshot wounds that entered the right side of his chest. The deputy testified the wounds were consistent with the bullets being fired through a window before hitting Bradley. He also confirmed that a shot was fired into the floor of the kitchen area, inside the rear door to the home.

The circuit court took the matter under advisement and thereafter issued a written order denying Petitioner's motion for immunity. Petitioner proceeded to trial and was convicted as charged. The court of appeals affirmed without oral argument in an unpublished opinion issued pursuant to Rule 220(b), SCACR. Petitioner asserts error to this Court in the denial of his motion for immunity.

## II. STANDARD OF REVIEW

"Circuit courts utilize pretrial hearings to determine whether a defendant is entitled to immunity under the Act, employing a preponderance of the evidence standard." *State v. Cervantes-Pavon*, 426 S.C. 442, 449, 827 S.E.2d 564, 567 (2019). This Court, in turn, reviews an immunity determination for an abuse of discretion.

*Id.* "An abuse of discretion occurs when the [circuit] court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *State v. Jones*, 416 S.C. 283, 290, 786 S.E.2d 132, 136 (2016).

## III. DISCUSSION

### A. Circuit Court's Role as Fact-Finder

Petitioner's first point asserts the court of appeals erred in upholding the denial of his motion for immunity because the circuit court abdicated its role as the fact-finder when it ruled a jury, not the court, must decide whether the individual Petitioner was defending was without fault in bringing on the difficulty. To address this point, we shall consider (1) the Act and developing case law regarding its application, and (2) the role the circuit court played in Petitioner's case.

### (1) The Act and its Application

The "Stand Your Ground Law," as the Act is informally known, was enacted by the South Carolina General Assembly in 2006 and provides a person "is immune from criminal prosecution and civil action for the use of deadly force" in circumstances that are permitted by the Act or by another provision of law. S.C. Code Ann. § 16-11-450(A) (2015). By its terms, the Act does not apply to the use of deadly force against law enforcement officers. *Id.*

We have observed that "[t]he Act codified the common law Castle Doctrine and extended its reach." *State v. Glenn*, 429 S.C. 108, 117, 838 S.E.2d 491, 495 (2019) (citing S.C. Code Ann. § 16-11-420(A)). "Under the Castle Doctrine, '[o]ne attacked, without fault on his part, on his own premises, has the right, in establishing his plea of self-defense, to claim immunity from the law of retreat, which ordinarily is an essential element of that defense.'" *Id.* at 117, 838 S.E.2d at 495–96 (alteration in original) (quoting *Jones*, 416 S.C. at 291, 786 S.E.2d at 136).

The General Assembly has stated it is "its intent to provide the protections of the Act to persons within their own home facing not only unwelcome intruders but also 'attackers,' including those who are initially invited into the home and later place the homeowner in reasonable fear of death or great bodily injury." *State v. Douglas*, 411 S.C. 307, 331, 768 S.E.2d 232, 245 (Ct. App. 2014) (citing S.C. Code Ann. § 16-11-420, "Intent and findings of General Assembly"). The Act defines "great bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of a bodily member or organ." S.C. Code Ann. § 16-11-430(2).

In section 16-11-440, the General Assembly has set forth the circumstances justifying the use of deadly force. S.C. Code Ann. § 16-11-440. While some parts of this statute, such as subsection (A), address forcible intrusions at residences, Bradley was initially an invited guest before he reportedly attacked Wilson. Consequently, Petitioner sought immunity under subsection (C), which generally provides that one who is not engaged in unlawful conduct and who is "attacked in another place where he has a right to be"[5] has no duty to retreat and may use deadly force if he reasonably believes it is needed to (1) **prevent** death or great bodily injury to himself or another, or (2) **prevent** the commission of a violent crime. We emphasize the General Assembly's use of the word "prevent" because it underscores the Act's protective focus; its terms do not require the undesirable harms to occur before defensive action is justified. Subsection (C) provides in full as follows:

> (C) A person who is not engaged in an unlawful activity and **who is attacked** in another place where he has a right to be, including, but not limited to, his place of business, has no duty to retreat and **has the right to stand his ground and meet force with force, including deadly force, if he reasonably believes it is necessary to prevent** death or great bodily injury to himself or another person or to prevent the commission of a violent crime as defined in Section 16-1-60.[[6]]

*Id.* § 16-11-440(C) (emphasis added).

This Court has previously recognized that, while the Act clearly affords immunity from prosecution, it contains no procedures or standards for its implementation. As a result, the Court has found it necessary, in a series of decisions, to fill such gaps judicially, where the General Assembly has not specified the procedures legislatively. *See State v. Duncan*, 392 S.C. 404, 409, 709 S.E.2d 662, 664 (2011) ("Whether immunity under the Act should be determined prior to

---

[5] The phrase "another place where he has a right to be" may also include a residence. *Jones*, 416 S.C. at 295, 786 S.E.2d at 138.

[6] Section 16-1-60's definition of a "violent crime" includes such offenses as assault and battery of a high and aggravated nature ("ABHAN") and an attempt to commit ABHAN or another violent offense. *See* S.C. Code Ann. § 16-1-60 (Supp. 2021); *see also id.* § 16-1-80 (2015) ("A person who commits the common law offense of attempt, upon conviction, must be punished as for the principal offense.").

trial is an issue of first impression in this state.  Further, the Act does not explicitly provide a procedure for determining immunity."); *State v. Manning*, 418 S.C. 38, 43, 791 S.E.2d 148, 150 (2016) ("Neither the Act, nor *Duncan*, sets forth a specific type of hearing or procedure to be followed when a criminal defendant claims immunity under the Act."); *State v. Cervantes-Pavon*, 426 S.C. 442, 452 n.4, 827 S.E.2d 564, 569 n.4 (2019) ("While the Act does not require a written order upon an immunity determination, specific findings of fact and conclusions of law are critical to reviewing courts, particularly given the gravity of the circumstances these cases necessarily involve.").

In *Duncan*, one of our earlier decisions, we made several fundamental determinations as matters of first impression.  We found the Act requires a pretrial ruling by the circuit court—and did not simply create a new affirmative defense— because the General Assembly has expressly provided an individual will be "immune from criminal prosecution."  *Duncan*, 392 S.C. at 410, 709 S.E.2d at 665. We further determined in *Duncan* that the circuit court should utilize a preponderance of the evidence standard of proof when considering whether a defendant is entitled to immunity under the Act, and an appellate court should review the circuit court's ruling to determine if it is supported by the evidence.  *Id.* at 411, 709 S.E.2d at 665.

Thereafter, in the 2013 case of *Curry*, we found it necessary to "interpret what we believe[d] to be the legislative intent regarding a trial court's authority to weigh the underlying claim of self-defense in determining an accused's entitlement to immunity."  *Curry*, 406 S.C. at 371, 752 S.E.2d at 266.  We concluded a defendant must show, by a preponderance of the evidence, that he has a valid claim of self-defense and reasoned the circuit court must, therefore, consider all of the elements of self-defense—except the duty to retreat:

> Consistent with the Castle Doctrine and the text of the Act, a valid case of self-defense must exist, and **the trial court must necessarily consider the elements of self-defense** in determining a defendant's entitlement to the Act's immunity. This includes all elements of self-defense, **save the duty to retreat**.

*Id.* (emphasis added); *accord Jones*, 416 S.C. at 300–01, 786 S.E.2d at 141.  We noted there are four elements to establishing a claim of self-defense, as outlined below:

First, the defendant must be without fault in bringing on the difficulty. Second, the defendant must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger. Third, if his defense is based upon his belief of imminent danger, a reasonably prudent man of ordinary firmness and courage would have entertained the same belief. If the defendant actually was in imminent danger, the circumstances were such as would warrant a man of ordinary prudence, firmness and courage to strike the fatal blow in order to save himself from serious bodily harm or losing his own life.[7] Fourth, the defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance.

*Curry*, 406 S.C. at 371 n.4, 752 S.E.2d at 266 n.4 (quoting *State v. Davis*, 282 S.C. 45, 46, 317 S.E.2d 452, 453 (1984)). We reiterated, however, that "[i]t is the fourth element—the duty to retreat—that is excused under the Act and the Castle Doctrine." *Id.*

The same year *Curry* was published, the Court addressed what it characterized as "dicta" appearing in the *Duncan* decision regarding the procedure for appeal in immunity cases. *See State v. Isaac*, 405 S.C. 177, 185, 747 S.E.2d 677, 681 (2013). Specifically, we clarified that, while the grant of a motion for immunity is immediately appealable because it is a final order that ends the case, the denial of a motion is distinguishable because it is not a final order ending the case and, consequently, the denial of a motion for immunity is not immediately appealable. *Id.* at 182–85, 747 S.E.2d at 679–81. In addition, we determined there was no evidence of legislative intent that the Act apply retroactively, so we found the protections of the Act did not extend to a case where the underlying incident occurred prior to the Act's effective date. *Id.* at 186–87, 747 S.E.2d at 681–82.

---

[7] The reference to a reasonable belief of imminent danger echoes language in the Act. We have observed that an individual has the right to act on appearances, even if that belief is ultimately mistaken. *State v. Scott*, 424 S.C. 463, 472, 819 S.E.2d 116, 120 (2018). However, the belief must be objectively reasonable. *Douglas*, 411 S.C. at 328, 768 S.E.2d at 244.

More recently, the Court revisited the Act and concluded the circuit court should perform a proximate cause analysis when considering the requirements in subsection 16-11-440(C) that the person attacked must be someone who was "not engaged in an unlawful activity" and was in a "place where he ha[d] a right to be." *See State v. Glenn*, 429 S.C. 108, 124, 838 S.E.2d 491, 499 (2019) ("We [] hereafter require circuit courts during pretrial *Duncan* hearings to conduct a proximate cause analysis before determining whether a person seeking immunity under the Act satisfies subsection 16-11-440(C), if applicable.").

We explained that "analyzing a defendant's 'right to be' in a place where he is attacked under [sub]section 16-11-440(C) without considering proximate cause or a causal connection to the incident leaves an innocent person's ability to seek the Act's protection up to happenstance, which we [] do not believe was the intent of the Legislature." *Id.* at 119–20, 838 S.E.2d at 497. Further, we found "a proximate cause analysis must also be applied to the unlawful activity element of subsection (C)." *Id.* at 120, 838 S.E.2d at 497; *see also id.* at 120 n.4, 838 S.E.2d at 497 n.4 ("Here, the circuit court properly applied a proximate cause analysis to examine whether Glenn was engaged in unlawful activity at the time of the incident. In its oral ruling, the court found Glenn was not engaged in any unlawful activity—despite the fact he was carrying an illegal weapon at the time of the shooting—because his possession was not the proximate cause of the incident.").

### (2) Circuit Court's Role in Petitioner's Case

Turning to Petitioner's case, we note the circuit court conducted a pretrial *Duncan* hearing on Petitioner's motion for immunity and later issued a written order denying the motion. In its order, the circuit court correctly cited *Duncan* for Petitioner's burden of proof—a preponderance of the evidence—and acknowledged both the law of self-defense and the legal principle that a person has the right to act in defense of another person if the person being protected would have had the right to kill the assailant in self-defense.

The circuit court summarized the evidence presented at the hearing and observed that "the core facts are largely uncontested." However, the circuit court stated, "Despite the general consensus regarding the basic facts, there was some dispute as to the cause and nature of the argument between Wilson, Kirk, and Bradley." The circuit court concluded Petitioner failed to meet his burden of

showing that he had the right to act in defense of another "because he did not prove that Wilson was without fault in bringing about the difficulty."[8]

The circuit court explained the evidence was conflicting on this particular element, so it presented "a quintessential jury question" that must be decided by a jury, citing this Court's decision in *Curry*:

> **Whether or not a defendant is without fault in bringing on the difficulty presents 'a quintessential jury question' which is 'not a situation warranting immunity from prosecution.' <u>Curry</u>, [406 S.C. at 372,] 752 S.E.2d at 267.** Since the Defendant, claiming to have acted in defense of Wilson, is only entitled to immunity if Wilson was entitled to act in self-defense, it becomes a material question as to whether Wilson was at fault in bringing about the difficulty. As a matter of law, one is not entitled to act in defense of others if the other person provoked the encounter and therefore would not be entitled to act in self-defense. *See* <u>State v. Jackson</u>, [384 S.C. 29,] 681 S.E.2d 17 (S.C. Ct. App. 2009). **The evidence presented conflicting views as to Randy Wilson's involvement in the argument that led to the fatal encounter, and that presents a factual question that must be answered by a jury.**

(Emphasis added.) The circuit court's ruling was issued in early 2017 and, as noted above, it relied on a 2013 decision from this Court, *Curry*.

Subsequent decisions from this Court, however, have distinguished *Curry* on the basis the immunity motion in *Curry* was made at the directed verdict stage of trial because the parties did not have the benefit of the Court's decision in *Duncan* calling for a pretrial hearing and ruling. The Court has since clarified that a conflict in the evidence does not automatically warrant the denial of immunity. Rather, the circuit court must weigh the evidence and make its own credibility and factual findings before reaching a decision as to immunity. *See, e.g.*, *State v. Andrews*, 427 S.C. 178, 181, 830 S.E.2d 12, 13 (2019). In *Andrews*, the Court acknowledged that

---

[8] The circuit court found it need not consider the remaining elements of self-defense because the first element was dispositive.

the reference to a "quintessential jury question" in *Curry* "has been the source of much confusion for the bench and bar":

> In *Curry*, we explained the accused's 'claim of self-defense presented a quintessential jury question,' which did not warrant immunity from prosecution, and therefore, we held the claim was properly submitted to the jury, with the claim of self-defense having been fully presented at that stage of trial. 406 S.C. at 372, 752 S.E.2d at 267. **This excerpt from *Curry* has been the source of much confusion for the bench and bar. We take this opportunity to emphasize that aspect of *Curry* was related to its specific and unique procedural posture at trial—a motion for directed verdict—and was not intended to allow circuit courts to automatically deny immunity in cases with conflicting evidence.**

*Id.* (emphasis added). In *Andrews*, we also referenced the guidance provided in another decision that distinguished *Curry*, *State v. Cervantes-Pavon*, 426 S.C. 442, 827 S.E.2d 564 (2019).

In *Cervantes-Pavon*, this Court reversed the circuit court's denial of a motion for immunity and remanded for a new immunity hearing based on multiple errors of law, including the circuit court's misapplication of *Curry*. 426 S.C. at 451–52, 827 S.E.2d at 569. We noted that, in *Curry*, the testimony of the witnesses "varied substantially," as the defendant testified that he pulled a gun because he believed the victim was lunging at him, but the evidence showed the victim was shot six times in the back and the defendant had told investigators that he "blacked out" during the incident. *Id.* at 451, 827 S.E.2d at 569.

We reiterated, however, that conflicts in the evidence do not automatically result in the denial of immunity because the role of the circuit court in immunity proceedings is to sit as the fact-finder in the first instance and to weigh the evidence:

> But just because conflicting evidence as to an immunity issue exists does not automatically require the court to deny immunity; the court must sit as the fact-finder at this hearing, weigh the evidence presented, and reach a conclusion under the Act. Of course, at the conclusion of any given hearing, if the circuit court determines the

> movant has not met his burden of proof as to immunity, the case will go to trial, and the issue of self-defense may—depending upon the evidence presented at trial—be presented to the trial jury.

*Id.* "Thus, the relevant inquiry is not merely whether there is a conflict in the evidence but, rather, whether the accused has proved an entitlement to immunity under the Act by a preponderance of the evidence." *Andrews*, 427 S.C. at 181, 830 S.E.2d at 13.

Moreover, in examining the issue of self-defense, we note that, even if a circuit court finds an individual was initially at fault in bringing on the difficulty, there are circumstances in which the right to self-defense may be restored. *See State v. Bryant*, 336 S.C. 340, 345, 520 S.E.2d 319, 322 (1999) ("One's right to self-defense is restored after a withdrawal from the initial difficulty with the victim if that withdrawal is communicated to the victim by word **or act**." (emphasis added)). In the current case, Petitioner has argued, *inter alia*, that even if Wilson were somehow considered the initial aggressor for disturbing Bradley's belongings, which he vigorously contests, it was undisputed that Wilson tried to retreat to his home during the altercation, but was physically prevented from doing so by Bradley, a point Petitioner asserted was confirmed by Kirk's own testimony at the hearing. As a result, Petitioner maintains that, because Wilson had communicated his withdrawal from the altercation by his actions, Wilson's ability to claim self-defense would have been reinstated, and Petitioner would not have been precluded from asserting a claim of defense of another.

Although the circuit court summarized the evidence that was presented at the pretrial hearing and observed that the "core facts" were undisputed, it never engaged in a weighing of the evidence, and it did not make any specific credibility or factual findings as to any aspect of the testimony, including the arguments concerning Wilson's alleged withdrawal from the altercation. Instead, the circuit court appeared to conclude Petitioner failed to meet his burden of showing Wilson was not at fault in bringing on the difficulty because the evidence in this regard was conflicting and, therefore, presented a "quintessential jury question," relying on the precedent of *Curry*. Our review of the record indicates the State also focused on *Curry* at the immunity hearing and extensively asserted the evidence was conflicting and required submission of the matter to a jury. For all the foregoing reasons, we hold Petitioner correctly argues in his first point to this Court that the circuit court committed an error of law in ruling on the motion for immunity because it abdicated its role as the

fact-finder by ruling a jury, not the court, must decide whether the individual Petitioner was defending was without fault in bringing on the difficulty.

We emphasize that a circuit court, as the designated fact-finder in this matter, must provide adequate findings to support its decision so an appellate court can perform its role of reviewing the ruling under an abuse of discretion standard. *See Cervantes-Pavon*, 426 S.C. at 452 n.4, 827 S.E.2d at 569 n.4 (stating "specific findings of fact and conclusions of law are critical to reviewing courts, particularly given the gravity of the circumstances these cases necessarily involve"). Further, the ruling must be based solely on the evidence presented at the pretrial hearing. *Id.* at 452–53, 827 S.E.2d at 569 ("[W]e agree with our sister state of Georgia that, 'while the trial court's pretrial immunity ruling and the jury's verdict on a claim of self-defense may apply the same statutory justification standard, the court's ruling must be based solely on the evidence presented at a pretrial hearing, while the jury's verdict must be based solely on the evidence presented at trial, which may be considerably different.'" (citation omitted)). In the current appeal, there are no specific findings by the circuit court to enable this Court to adequately undertake its appellate review.

Further, although the court of appeals cited several recent cases from this Court distinguishing *Curry* and clarifying the appropriate procedure for deciding an immunity motion, the court of appeals did not adequately apply them to Petitioner's appeal before issuing an unpublished opinion under Rule 220(b), SCACR, which affirmed the circuit court's ruling. In contrast, in an unrelated appeal, the court of appeals was able to properly analyze the circuit court's denial of immunity, where the circuit court weighed the evidence and made findings on the salient points, and the court of appeals considered whether the evidence supported those findings. *Cf. State v. Marshall*, 428 S.C. 11, 20, 832 S.E.2d 618, 623 (Ct. App. 2019) ("In the instant case, the circuit court found numerous inconsistencies called Marshall's credibility into question and resulted in Marshall failing to establish entitlement to immunity by the preponderance of the evidence."); *id.* at 21, 832 S.E.2d at 623 ("Based upon our review of the record, we find the circuit court properly weighed the evidence presented and did not abuse its discretion in denying immunity under the Act."). As a result, we hold the court of appeals erred in upholding the circuit court's denial of Petitioner's motion for immunity.

**B.     Decision Regarding Immunity**

Although Petitioner's second point asks the Court to hold that he is entitled to immunity based on the current record, we conclude a remand to the circuit court is necessary because the circuit court is in the best position to assess witness credibility and make the necessary findings of fact.  *See generally State v. Glenn*, 429 S.C. 108, 123, 838 S.E.2d 491, 499 (2019) ("The circuit court is the fact-finder in immunity hearings, and we are reluctant to infer findings of fact which do not appear in the record."); *State v. Douglas*, 411 S.C. 307, 316, 768 S.E.2d 232, 238 (Ct. App. 2014) ("[T]he abuse of discretion standard of review does not allow [an appellate] court to reweigh the evidence or second-guess the trial court's assessment of witness credibility.").

In this particular case, although we find a remand to the circuit court is needed, we leave it to the circuit court's discretion to determine whether to issue a new order based on the record of the hearing it has already conducted, or whether to conduct a new immunity hearing before issuing a ruling.  In either case, the circuit court shall make specific findings supporting its determination after considering all of the procedures outlined herein regarding the proper application of the Act.

## IV.  CONCLUSION

The decision of the court of appeals is reversed, and we remand the matter to the circuit court for further proceedings in accordance with this decision.

**REVERSED AND REMANDED.**

**KITTREDGE, HEARN, and FEW, JJ., and Acting Justice Blake A. Hewitt, concur.**